The inhabitants of the town of GUILFORD *against* The inhabitants of the town of OXFORD.

In *October* 1828, *A.*, a white man, settled in *O.*, married *B.*, a white woman, settled in *G.* In *March* 1829, *B.* was delivered, at *N.*, of a coloured child, begotten by a black man, before the marriage ; *A.* being, at the time of the marriage, ignorant of her pregnancy. In *May* 1829, *A.* preferred his petition to the General Assembly, stating these facts, and praying for a divorce. The General Assembly found the facts stated, and passed an act, dissolving

*New-Haven,*
July, 1832.

Guilford
*v.*
Oxford.

the marriage contract between *A.* and *B.*, and divorcing *A.* from *B.* his present wife.   In an action brought by *G.* against *O.* for the maintenance of *B.* and her infant child subsequent to the divorce, it was held, 1. that the marriage was originally valid; 2. that the act of divorce did not avoid it *ab initio;* 3. that *B.*, by virtue of the marriage, took the settlement of *A.* in *O.;* and 4. that the derivative settlement of *B.*, thus acquired, was communicated to her illegitimate child.

This was an action of *assumpsit* to recover the expense of relief and maintenance, furnished, by the plaintiffs, to *Rhoda Bryan* and her infant child, alleged to be paupers, having a legal settlement in the town of *Oxford.*

The case was as follows.   *Alanson Bryan,* the husband of *Rhoda,* was, at the time of his intermarriage with her, and still is, a settled inhabitant of *Oxford.*   Before the marriage and until that time, she was an inhabitant of *Guilford* or *Wallingford.*   The marriage took place in *October* 1828; and in *March* following, she was delivered, at *New-Haven,* of a coloured child, begotten by a black man, before the marriage, and soon afterwards went to *Guilford,* where she, together with the infant, became chargeable to and was supported by *Guilford;* of which *Oxford* had due notice.   *Alanson Bryan* and *Rhoda* are both white persons; and at the time of the marriage, he was ignorant of her pregnancy.

In *May* 1829, he preferred his petition to the General Assembly, stating, that confiding in the representations of said *Rhoda,* that she was a woman of chastity and virtue, he was induced to marry her; but that at the time of the marriage, she was pregnant with a bastard mulatto child, of which she was delivered in *March* 1829, about five months after the marriage; and praying for an act of divorce.   These allegations, with some others not necessary to be specified, were found to be true; and the General Assembly thereupon passed an act or resolve in these words : " *Resolved* that the marriage contract between said *Alanson Bryan* and said *Rhoda Bryan* be, and the same hereby is, dissolved ; and that said *Alanson Bryan* be, and hereby is, divorced from the said *Rhoda,* his present wife."

The case was reserved for the advice of this Court.

*Sherman* and *Seeley,* for the plaintiffs, contended, 1. That the marriage in question was a valid marriage, until it was dis-

solved, by the act of divorce. This position depends on the operation of the facts in the case *at law*, and not *in chancery ;* for chancery has never assumed any jurisdiction over this sub- ject, in *England* or *Connecticut.* *The course of chancery proceedings is inappropriate ; for that court grants relief in a modified form, according to equity ;—if it rescinds a contract, it is *on terms.* The present subject admits of no such interposition.

At law, the civil grounds of annulling the marriage contract, are, want of age, want of reason, and want of consent. This case, it is said, embraces the latter, *viz.* want of consent.— These same grounds will avoid a bond ; and to what extent, or in what sense, a want of consent will avoid any contract, is well settled.

In the first place, a *specialty* cannot be avoided at law, by any misrepresentation or any fraud, by which the party was induced to execute it. If in ejectment the deed is disputed, because it embraced a different farm from that intended to be conveyed, or because the grantor had no title, or because the title was encumbered with dower ; or if in an action on a bond, it is disputed for similar reasons ; the grantee or obligee will prevail at law. But if the grantor or obligor signed by coercion, as if another used his hand against his will ; or if he was imposed on in the execution, as if another writing was intended to be signed, and the deed was substituted by fraud ; this operates directly on the act, and avoids it. But where the act is what the party intended, but was induced by false motives, the deed is always valid at law.

Secondly, in relation to simple contracts ; a consideration being necessary to their validity, a fraud by which there is *no consideration*, will avoid them at law. But if the consideration is of *less value* only,—as where a note is given for a lame or diseased horse,—they are valid at law, although a court of chancery will give relief. In some cases, this defence, in *assumpsit* on a special contract, has gone to lessen damages, but has never been effectual as a defence.

In this case, there was no fraud in the execution. *Alanson Bryan's* object was to get a wife ; and he got one. He got what he intended. [*Daggett*, J. He got *a little more* than he intended.] This is not like the case of corporal imbecility, where the fraud is *total.* Nothing pertains to marriage, for

which it is indispensable, except the *deductio ad thalamum.* Living in the same family, friendship, common interest, united effort for promoting domestic happiness, and every thing else for which marriage is had, is lawful without marriage, except sexual intercourse. *That* can be legalized by marriage only: it is *all* to which marriage is indispensable. Corporal imbecility frustrates this object; and is, for that reason, the only thing intended, in the law of marriage and divorce, by fraudulent contract. This view of the subject is sanctioned by the case of *Benton* v. *Benton,* 1 *Day* 111. 116. which was decided upon the soundest principle. The divorce, in the present case, proceeded on the ground that the husband supposed the wife to be chaste, whereas she was lewd. In *England,* such a fraud would not be a ground of divorce even *a mensa.* 1 *Bla. Comm.* 440. Want of chastity in the woman is no more a disability than the same infirmity in the man. The parties may be deceived in that respect, as they may be in regard to the age, temper, property, family connexions, &c. The difference is only in degree,—not in kind. Ch. J. *Swift* says: " The issue will in no case be bastardized, by the divorce; because the marriage is legal and valid until annulled." 1 *Sw. Dig.* 25.

Sound policy requires, that the matter in question should not be shewn, except by a decree of divorce operating *in rem.* A court on which the jurisdiction is conferred, can alone investigate the fact. It cannot be enquired into collaterally, for the purpose of avoiding a claim for the support of the wife, or to prove or disprove a settlement, or for any other purpose.

Where our superior court has granted divorces for fraudulent contract on other grounds, the decree has been considered, not as a declaration that the marriage was void, but as dissolving a valid marriage. Therefore, in *Benton* v. *Benton,* 1 *Day* 112. the court allowed *alimony;* which it could not have done, if there had been no marriage.

Again; if this case, as is contended, is embraced in our statute authorizing divorces, this act of divorce is void, its allowance being the exercise of *judicial* power, which is inhibited to the legislature, by the 2nd article of the constitution.

2. That the resolve of the General Assembly does not purport to declare the marriage null *ab initio,* but merely to dissolve a subsisting contract. Its terms are not retroactive. It declares

that the marriage contract *is thereby dissolved*, and that *Alanson Bryan* is divorced from the said *Rhoda, his present wife.* Both these forms of expression, so far from rescinding the marriage *ab initio*, import its previous validity.

3. That the marriage being valid, at the time, the wife acquired thereby a settlement with her husband in *Oxford.* 1 *Sw. Syst.* 169.   2 *Sw. Dig.* 823.   1 *Bla. Comm.* 363.   *Hebron* v. *Colchester,* 169. 174, 5.   *Danbury* v. *New-Haven,* 5 *Conn. Rep.* 584.

4. That the child, being a bastard, takes the settlement of its mother.   *Canaan* v. *Salisbury,* 1 *Root* 155.   1 *Sw. Dig.* 48. 2 *Sw. Dig.* 821.   2 *Conn. Rep.* 19, 20.   5 *Conn. Rep.* 586. 6 *Conn. Rep.* 37.   *Reeve's Dom. Rel.* 276.

*N. Smith* and *Mix,* for the defendants, insisted, 1.   That the marriage having been obtained by a fraud of the woman, of the grossest character,—and that too affecting the marital relation, —it was void *ab initio,* and she acquired no rights by virtue thereof.   A contract procured by fraud, in point of law, is no contract.   The *consensus,* essential to its existence, is totally wanting.   *Reeve's Dom. Rel.* 206, 7.   2 *Kent's Comm.* 66. 69. *Middleborough* v. *Rochester,* 12 *Mass. Rep.* 363.

2. That if the contract of marriage was valid until set aside, yet as the divorce was granted for a cause which existed at the time of the marriage, the marriage was thereby annulled from that time—*i. e. ab initio.*

3. That the effect of a divorce, in all cases, is to take from the husband his interest in his wife's land, and to give her her former settlement, leaving nothing in force except the legitimacy of the issue.   *Reeve's Dom. Rel.* 209.   1 *Sw. Dig.* 25. In *Hebron* v. *Marlborough,* 2 *Conn. Rep.* 18. 20. the husband, at the time of the marriage, was settled in *Marlborough ;* the previous settlement of the wife being in *Taunton,* in *Massachusetts.*   He afterwards obtained a decree of divorce, on the ground that she had a bastard child three months after the marriage.   This court decided, that she "had no settlement in this state ;" and consequently, that her bastard child had no *derivative* settlement in *Marlborough,* though that was the place of its settlement *by birth.*   In *Legg* v. *Legg,* 8 *Mass. Rep.* 99. it was held, that the right of the husband in his wife's *choses in action,* was extinguished, by the divorce.   In *Starr* v. *Pease* & al. 8 *Conn. Rep.* 541. and *Barber* v. *Root,* 10

*Mass. Rep.* 260. it was held, that the right of the husband in the wife's land, was terminated, by the divorce. By the decision in *Kriger* v. *Day*, 2 *Pick.* 316. the wife was restored to land which had been alienated, by the husband, before the divorce, without her consent.

4. That a bastard child does not take its mother's *derivative* settlement; and consequently, if the mother acquired a settlement in *Oxford*, by virtue of the marriage, yet the child had no settlement there. *Hebron* v *Marlborough*, 2 *Conn. Rep.* 18. This child was not *Alanson Bryan's* issue; nor was it born in *Oxford*.

HOSMER, Ch. J. The defendants insist, that the marriage, having been obtained by fraud, was void *ab initio*, and that by the act of the General Assembly, it was *ipso facto* avoided; of consequence, that the paupers were not inhabitants of *Oxford*. On the other hand, the plaintiffs contend, that the paupers were inhabitants of *Oxford*, the marriage not being void *ab initio*, and the act of divorce not being retroactive.

The case presents three questions for decision. First, Was the marriage valid or void? Secondly, If valid, did the decree of divorce avoid it *ab initio*, or only *in futuro*? And thirdly, If the divorce was not retroactive, where are the paupers settled?

1. The position advanced by the defendants is this; that fraud in the procurement of the marriage, by the said *Rhoda*, rendered it *ipso facto void.* I am of a different opinion; that is, that the marriage was alone avoided by the divorce.

In support of the proposition advanced by the defendants, no aid is derived from the *English* determinations. The civil disabilities created by law only render a person incapable of entering into the marriage contract; such as, a prior marriage; want of age or of consent of parents or guardians; or want of reason. But the canonical disabilities of precontract, consanguinity, affinity, and corporal imbecility only make the marriage voidable until sentence of nullity is obtained. 1 *Bla. Comm.* 434.

By the law of this state (*Stat. p.* 178.) all the causes of divorce are supervenient, and arise posterior to the marriage, except the one of fraudulent contract. Great efforts were

made, in the case of *Benton* v. *Benton*, 1 *Day* 111. to fix a construction on the above expression of *fraudulent contract*, invalidating *ab initio* all marriages that were procured by the fraud of one of the parties. But in that case, it was decided, that the term *fraudulent contract*, in the statute concerning divorces, was confined to those causes only, which render a marriage unlawful from the beginning ; such as consanguinity, affinity, and the like. These the legislature, it was believed, considered to be *in fraudem legis ;* and therefore, authorized a separation *a vinculo matrimonii.* To construe the term *fraudulent contract* in its large sense, it was declared by the court, would degrade the marriage contract, a main pillar on which society is founded, to a level with the most trifling bargains ; and would go far to subvert the ends of marriage, by giving occasion to a promiscuous intercourse of the sexes. I admit that two respectable men, formerly judges of this Court, have pointedly questioned the propriety of the above decision. " If it be founded in justice," says the late Ch. J. *Reeve* in his law of the Domestic Relations, (*p.* 206.)—and to the same effect is the Digest of Ch. J. *Swift*—" that contracts which respect ordinary matters should be treated as void, when obtained by fraudulent practices, why then should a contract the *most important* that can be entered into, be deemed inviolable, when obtained by such fraudulent practices ?" For the plain reason, that it *is* a contract the most important of any. Ordinary contracts, which respect property only, may, with propriety and convenience, be tested, by the rule of private justice ; but the marriage contract, on which so much depends for the protection, and maintenance, and education of children, and in which the public have so essential a stake, demands a higher principle. It is preeminently a case, to which is applicable the law maxim, *Quod est inconveniens, non est licitum.* There is no analogy between the cases. It has been supposed, that the rule of unlimited discretion, applied to the preceding subject, would be so tempered, by the exercise of a wise caution, as to prevent any pernicious effects that otherwise might result. I cannot admit the force of this reasoning ; and should be very unwilling to see the most important interests of society placed on so precarious a foundation. It is the substitution of hope for that moral certainty, which the subject demands. Very different is the opinion of Lord *Cam-*

*New-Haven,*
*July, 1832.*

Guilford
*v.*
Oxford.

den, in *Doe* d. *Hindson* v. *Kersey,* 1 *Day* 81. n. in which he characterizes unlimited discretion as being "the law of tyrants, always unknown, different in different men, casual, dependent on constitution, temper and passion; in the best, oftentimes caprice; and in the worst, every vice, folly, and passion to which human nature is liable."

Undoubtedly, there are cases of fraudulent contract for which divorces have been allowed. Vide 2 *Kent's Comm.* 76,7. Such are divorces *causa impotentiæ* and others of a similar nature; and to such cases the term in the statute is in *Benton* v. *Benton* considered as extending. They are not the common law cases of *allegatio falsi vel suppressio veri;* they are not this case; but they are cases which wholly defeat the great object of the contract, by shewing the fraud to consist in the parties being incapable of performing the duties of matrimony.

That the marriage, therefore, was valid, I think, there is no doubt.

2. Whether the decree of divorce rendered the marriage void *ab initio,* or only *in futuro,* is the next subject of consideration.

On this point the construction of the decree is obvious and of no difficulty. Before entering on it, I remark, that if the legislature had intended to render the marriage absolutely and *ipso facto* void, clear and unequivocal expressions to this effect, would have been used.

The decree is couched in a very few words. It is resolved, that the marriage contract between said *Alanson Bryan* and said *Rhoda* be, and the same hereby is, dissolved. By the term *dissolved* is meant, broken or annulled; and in connection with the other part of the sentence, there is a declaration that the marriage no longer exists. The decree next contains this expression: "and that said *Alanson Bryan* be, and hereby is, divorced from his *present wife:*" that is, the marriage contract is dissolved, and from his *wife that now is,* he is forever separated and disjoined.

Thus, we have the entire decree, which has nothing in it retroactive, but consists wholly in the immediate operation of disuniting two persons from their then existing connection.

It is, therefore, unquestionable, that the divorce did not avoid the marriage *ab initio,* but only rendered it void *in futuro.*

3. Where, then, are the paupers settled? This is the re-
maining inquiry.

Before the above marriage, the said *Rhoda* was a settled inhabitant of *Guilford* or *Wallingford.* By her marriage with *Bryan,* who was an inhabitant of *Oxford,* she became settled in that town. This settlement remains, notwithstanding a divorce; it having no retroactive effect. The connection of *Rhoda* with her former settlement, by the preceding marriage, was annulled; and she became an inhabitant of *Oxford.* It however has been argued for the defendants, on the foundation of decided cases, that the divorce, by its usual necessary effect, put the parties *in statu quo,* and remitted *Rhoda* to her settlement existing at the marriage. The decisions cited have been misconceived. The case of *Legg* v. *Legg,* 8 *Mass. Rep.* 99. merely adjudged, that on a divorce *a vinculo,* choses in action given to the wife, and not reduced into possession, remain her property; and that of *Elizabeth Kriger* v. *John Day,* 2 *Pick.* 316. decided, that a divorce *a mensa et thoro,* decreeing the restoration of the wife's lands, pursuant to a statute law, restored to her such lands as had been alienated, by her husband. In *Barber* v. *Root,* 10 *Mass. Rep.* 260. and in *Starr* v. *Pease* & al. 8 *Conn. Rep.* 541. it was determined, that an execution against the husband, levied on lands of the wife during coverture, gave the creditor no interest in the lands, after a decree of divorce *a vinculo matrimonii;* and in the case of *Middleborough* v. *Rochester,* 12 *Mass. Rep.* 363. the court adjudged, that the marriage of a woman not having sufficient understanding to make a valid contract, did not change the place of her lawful settlement. None of these determinations have any bearing on the point of discussion; and this is so obvious, that a remark or two is all that will be necessary. The cases of *Legg* v. *Legg,* of *Barber* v. *Root* and of *Starr* v. *Pease* & al. proceed on this obvious ground, that after a divorce, as after the husband's death, the property of the wife not transferred by act of law to her husband, remains her own; that of *Kriger* v. *Day* is spent on the construction of a statute law of *Massachusetts,* and is wholly irrelevant; and that of *Middleborough* v. *Rochester* merely declares, that a person devoid of reason, cannot enter into the marriage contract, and by necessary consequence, that there can be none of the results of a legal marriage in her rights.

*New-Haven,*
*July, 1832.*

Guilford
*v.*
Oxford.

The settlement, then, of *Rhoda,* one of the paupers, being in *Oxford,* where is her illegitimate child settled?

It has been argued for the defendants, that inasmuch as the mother's settlement in *Oxford* was not in her own right, but was derived from her marriage; this derivative settlement is not communicated to her child; and the case of *Hebron* v. *Marlborough,* 2 *Conn. Rep.* 18. is supposed to warrant this position. But in that case, no such point was decided. It was merely adjudged, that the settlement of a bastard, born in this state, whose mother has no settlement here, is in the place of such bastard's birth. The effect of a derivative settlement, when the mother has none of any description, could not have been decided in that case. But in the case of *Danbury* v. *New-Haven,* 5 *Conn. Rep.* 534. the point was made and determined. It was said by the Court, " that a woman who gains a settlement by marriage, retains it, notwithstanding the death of her husband, until she gains another; and the settlement of her illegitimate children follows hers." This is a direct determination that by our law, the derivative settlement of a mother, acquired by marriage, is communicated to her illegitimate children. In passing, I cannot but observe, that in the state of *New-York,* by a statute is enacted the same law, thus bearing witness to the justice and convenience of the law, as established here. Vide *Canajoharie* v. *Johnstown,* 17 *Johns. Rep.* 41.

I would, therefore, advise the superior court, that *Oxford* is liable to the plaintiffs, the paupers being settled inhabitants of that town.

The other Judges were of the same opinion.

Judgment for plaintiffs.