## Benton *v.* Benton.

### In the Court below,

SARAH BENTON, *Petitioner;* JOHN BENTON, *Respondent.*

THIS was a petition to the Superior Court for a divorce.

The case, as stated in the petition, and found by the Court, was,—That on the 20th of September, 1800, the respondent and petitioner were lawfully married; that previous to their marriage, the respondent professed a sincere attachment to the petitioner; that she confided in his professions; that his professions, however, were bottomed upon fraud and deceit; that before the marriage, she had been begotten with child by him; that she had prayed out process against him, agreeably to the provisions of the statute concerning "bastards and bastardy"; that his body had been arrested, and was, at the time of the marriage, holden under arrest; that in that situation, and for the sole purpose of avoiding said process, he formed the fraudulent and wicked design of

*1803.*

TWEEDY
*v.*
PICKET.

The term *fraudulent contract,* in the statute concerning divorces, includes those causes only, which render the marriage unlawful from the beginning. The Superior Court are not vested with such a discretion, in cases of divorce, that their decree may not be revised in error.

1803.

BENTON
v.
BENTON.

marrying her; that at the time of solemnizing the marriage, he harboured the design immediately to leave her, and never to perform any of the duties of a husband to her; and that immediately on completing the marriage contract, he, in fact, deserted her, and had ever since lived in the total neglect of all the duties resulting from the marriage contract, on his part.

On these facts, the Superior Court granted the divorce, and allowed alimony.

*Allen* and *Staples*, for the plaintiff in error, contended, that the term "fraudulent contract," in the statute authorizing divorces, had an appropriate meaning, when applied to this subject, viz. *imbecility*, or *consanguinity*, which rendered the marriage a nullity from the beginning. (a)

*Smith*, (of Woodbury) for the defendant in error, insisted, that the statute intended fraudulent contract, in its general acceptation; but, if the Superior Court had erred, he contended, that their judgment could not be revised, as with regard to divorces it must be conclusive.

The judgment was reversed, unanimously.

By THE COURT. There are four causes, for either of which, the Superior Court are authorized, by statute, to grant bills of divorce: adultery; fraudulent contract; wilful desertion for three years, with total neglect of duty, on application of the injured correlate; and seven year's absence of one party, not heard of, which implies no injury, but is evidence of the death of the absent par-

(a) 3 *Bla. Com.* 94.

ty.  If the statute reaches this case, it must fall under the head of *fraudulent contract*; whether it does so, or not, is the question.

The phrase *fraudulent contract*, in common parlance, admits of great latitude of construction, and will include all those deceptive arts, to which the sexes, too frequently, have recourse, with a view to obtain, what they consider, an advantageous marriage connection; by setting off their persons, characters, tempers, circumstances, and connections, in a too favourable light; or by professions of ardent affection, which they either may not feel, or not in a degree equal to what they profess. These arts, though they meet with various degrees of indulgence, according to circumstances, are still inconsistent with truth and sincerity; and may be, and often are, productive of serious mischief: they partake of the nature of fraud, and a marriage grounded on them, is, in a sense, *a fraudulent contract.*  If the phrase be taken in this large sense, the statute would degrade the marriage contract, which, in its original design and institution, was to continue indissoluble, during the joint lives of the correlates, and which is a main pillar, on which society itself is founded, to a level with the most trifling bargains.  The legislature can never be intended to do this.  To grant divorces in the various cases of fraud, which may be practised, in different degrees, would go far to subvert the ends of marriage, by giving occasion to a promiscuous intercourse of the sexes, which could not fail, in its progress, to fill the earth with violence. The power to do this, therefore, would be a power to do mischief in a point of the greatest moment.  To draw the line between the degrees of fraud which would, and those which would not, justify a divorce, must be a matter of nice calculation; and this line must constantly va-

Q

1803.

BENTON
v.
BENTON.

ry, as the opinions of the judges, or the character of the times, shall chance to vary. The Superior Court, indeed, are as competent to exercise a sound discretion, in matters *referred* to their discretion, as any tribunal whatever; and if it were otherwise, no other tribunal will call their acts in question, which result from the exercise of a legal discretion, whatever opinions may be formed of those acts. But, that the Superior Court are not vested with an unlimited discretion to grant divorces, on the ground of *fraudulent contract*, taken in the unqualified sense explained, appears, not only from the reasons which have been drawn from the momentous and sacred import of the marriage contract, its divine origin, and its essential influence on society, in which respects it is elevated far above the rank of ordinary contracts; but it will further appear, from the following considerations.

Where a word or phrase of indeterminate meaning is used in a statute, its true import must be collected from its application to the subject matter, as explained and used by elementary and other law-writers. The phrase *fraudulent contract*, as applied to the subject of marriage and divorce, in the books, has obtained an appropriate and technical meaning; and is taken to imply a cause of divorce which existed previous to the marriage, and such a one as rendered the marriage unlawful *ab initio*, as consanguinity, corporal imbecility, or the like; in which case, the law looks upon the marriage as null and void, being contracted *in fraudem legis*, and decrees a separation *a vinculo matrimonii*. The legislature not having explained the phrase, it seems reasonable to suppose they used it in this well known and limited sense, and not as used in common parlance.

The legislature have precisely defined all the other causes of divorce mentioned in the statute, so as to leave nothing to discretion or construction; and it seems unreasonable to suppose, they would study such precision in defining those, while, at the same time, they intended to leave so much to discretion and construction, under the head of *fraudulent contract*, as they would have done, if the phrase be taken in its larger sense.

If, on the contrary, it be supposed, they meant the phrase should receive this broad construction, no good reason can be assigned, why they did not authorize the court to grant divorce in cases of cruelty, or for other cause, which they have, in their own proceedings and acts, on this subject, considered as a reasonable ground of divorce, for it is not more difficult to exercise a sound discretion, in these cases, than in those, which, on this supposition, will constantly occur, under the head of *fraudulent contract*: it would simply extend the field of discretion, its exercise would be equally safe, in both cases. The truth is, while they referred certain defined cases to the Superior Court, they reserved all other cases, which could not be well defined by law, to their own discretion, to be decided on their own merits, on the principles of general policy.

It remains to consider, whether the case spread upon the record comes under the head of *fraudulent contract*, in its *appropriate* sense.

It cannot be pretended the contract of marriage, in this case, was void *ab initio*, though the sole intention of the man in entering into it, was to avoid the process, under which he lay. He might have become of a better mind, and have faithfully performed the duties of a hus-

band ; in which case, there could have been no doubt of the validity of the marriage, however apparent his fraud might be, at the moment of solemnizing it. A marriage void *ab initio*, is a marriage contracted *in fraudem legis*, and cannot be made valid, by the volition of either, or both, of the parties. But, if this marriage might have been validated, by the volitions of the husband, after a short desertion, it might be, with equal reason, at any future period, during the joint lives of husband and wife ; nor ought any presumption to have been admitted, that it would not, until wilful desertion for three years, with total neglect of duty, had created another specific ground of divorce.

The desertion, in this case, is stated and found to have been *immediately* after the marriage was solemnized ; and hence we are to conclude, the marriage was not consummated, by *deductio ad thalamum*. But two answers may be given to this, each of which are conclusive : first, *deductio ad thalamum*, as to time, is not limited by law ; the proper time must depend on circumstances, and the joint consent of the correlates ; secondly, the previous cohabitation of the parties formed *the twain into one flesh*, as fully as *deductio ad thalamum* could do ; and when the marriage was solemnized according to the rites and forms of law, it was perfect and consummate, as any marriage can be, by *deductio ad thalamum*, after the marriage rites have been solemnized.