## MARION D. GOULD *vs.* ROY S. GOULD.

First Judicial District, Hartford, March Term, 1905.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

It is within the power of the legislature, in the interest of public health, to prohibit marriages between persons either of whom is epileptic, when the woman is under forty-five years of age; and to that extent chapter 325 of the Public Acts of 1895 (§§ 1354–1356 of the General Statutes) is a valid and constitutional Act.

A marriage in violation of the Act is not declared by it to be void, nor is it a nullity under the provisions of the common law as adopted in this State.

If, however, such a marriage was induced by the fraudulent concealment or representations of the epileptic as to his or her physical condition, it is within the power of the Superior Court, upon application of the other party, to grant a divorce upon the statutory ground (§ 4551) of "fraudulent contract."

The fraud which makes the contract of marriage "fraudulent," as that word is used in § 4551, is a fraud in law and upon the law. Such a fraud is accomplished whenever a person enters into that contract knowing that he is incapable of sexual intercourse, and yet, in order to induce the marriage, designedly and deceitfully concealing that fact from the other party, who is ignorant of it and has no reason to suppose it to exist; and whether such incapacity proceeds from a physical or a merely legal cause is immaterial.

The case of *Benton* v. *Benton*, 1 Day, 111, overruled in so far as it limits divorces on the ground of "fraudulent contract" to instances in which the marriage was thereby rendered void *ab initio*.

Argued March 8th—decided August 5th, 1905.

ACTION for a divorce or a decree of nullity, brought to the Superior Court in Hartford County and heard on default before *Thayer, J.*, who dismissed the complaint. *Error and new trial ordered.*

*Hugh O'Flaherty* and *John J. Dwyer*, for the appellant (plaintiff).

No counsel appeared for the defendant.

BALDWIN, J. In 1895 a statute was enacted, of which the first section reads as follows: "No man and woman, either of whom is epileptic, imbecile, or feeble-minded, shall intermarry, or live together as husband and wife, when the woman is under forty-five years of age. Any person violating or attempting to violate any of the provisions of this section shall be imprisoned in the State prison not less than three years." Public Acts of 1895, p. 667, Chap. 325. *Cf.* General Statutes, § 1354. In 1899 the plaintiff, at the age of twenty-two, married the defendant, who was an epileptic. In 1903 a child was born, issue of the marriage, and soon afterwards the plaintiff, then first learning of the statute mentioned, left the defendant, and brought this suit for a divorce or a decree that the marriage was null and void. In her complaint she alleged that the defendant, though an epileptic, falsely and fraudulently concealed this fact from her and represented that he had never had epilepsy, in consequence of which representations she, believing them to be true, had been induced to enter the contract of marriage.

On the trial in this court, no argument was submitted in behalf of the defendant. The proper disposition of a cause of this character is however a matter of public concern, in the interest of society, and we feel bound to examine such considerations in support of the judgment appealed from as he might have urged, had he been represented by counsel. *Allen* v. *Allen*, 73 Conn. 54, 55.

Was the statute a valid act of legislation? It forbade the marriage of certain classes of persons, under any circumstances. One of these only, it is now necessary to consider,—that of epileptics. The provisions of the Act of 1895 were separable with respect to the different classes of persons with whom it deals, and so far as this action is concerned it is enough if it can be supported as to marriages contracted after its enactment by those in the condition of the defendant.

The Constitution of this State (Preamble and Art. I, § 1) guarantees to its people equality under the law in the rights to "life, liberty, and the pursuit of happiness."

*State* v. *Conlon*, 65 Conn. 478, 489–491. One of these is
the right to contract marriage, but it is a right that can
only be exercised under such reasonable conditions as the
legislature may see fit to impose. It is not possessed by
those below a certain age. It is denied to those who stand
within certain degrees of kinship. The mode of celebrating
it is prescribed in strict and exclusive terms. General
Statutes, § 4538.

The universal prohibition in all civilized countries of
marriages between near kindred proceeds in part from the
established fact that the issue of such marriages are often,
though by no means always, of an inferior type of physical
or mental development.

That epilepsy is a disease of a peculiarly serious and re-
volting character, tending to weaken mental force, and
often descending from parent to child, or entailing upon
the offspring of the sufferer some other grave form of
nervous malady, is a matter of common knowledge, of
which courts will take judicial notice. *State* v. *Main*, 69
Conn. 123, 135. One mode of guarding against the perpetu-
ation of epilepsy obviously is to forbid sexual intercourse
with those afflicted by it, and to preclude such opportunities
for sexual intercourse as marriage furnishes. To impose
such a restriction upon the right to contract marriage, if
not intrinsically unreasonable, is no invasion of the equality
of all men before the law, if it applies equally to all under
the same circumstances who belong to a certain class of
persons, which class can reasonably be regarded as one re-
quiring special legislation either for their protection or for
the protection from them of the community at large. It
cannot be pronounced by the judiciary to be intrinsically
unreasonable, if it should be regarded as a determination
by the General Assembly that a law of this kind is neces-
sary for the preservation of public health, and if there are
substantial grounds for believing that such determination
is supported by the facts upon which it is apparent that it
was based. *Holden* v. *Hardy*, 169 U. S. 366, 398 ; *Bissell*
v. *Davison*, 65 Conn. 183, 192. There can be no doubt

as to the opinion of the General Assembly, nor as to its resting on substantial foundations. The class of persons to whom the statute applies is not one arbitrarily formed to suit its purpose. It is certain and definite. It is a class capable of endangering the health of families and adding greatly to the sum of human suffering. Between the members of this class there is no discrimination, and the prohibitions of the statute cease to operate when, by the attainment of a certain age by one of those whom it affects, the occasion for the restriction is deemed to become less imperative.

While Connecticut was the pioneer in this country with respect to legislation of this character, it no longer stands alone. Michigan, Minnesota, Kansas and Ohio have, since 1895, acted in the same direction. 2 Howard on Matrimonial Institutions, 400, 479, 480; Laws of Ohio, 1904, p. 83. Laws of this kind may be regarded as an expression of the conviction of modern society that disease is largely preventible by proper precautions, and that it is not unjust in certain cases to require the observation of these, even at the cost of narrowing what in former days was regarded as the proper domain of individual right.

It follows that the statute in question was not invalid, as respects marriages contracted by epileptics, after it took effect.

The next question which presents itself is whether the marriage of the plaintiff was void.

A contract for any matter or thing against the prohibition of a statute is treated as void, although the statute does not declare it to be so, if such contract be relied on in any action as the foundation of the right of recovery. *Preston* v. *Bacon*, 4 Conn. 471, 480; *Finn* v. *Donahue*, 35 id. 216. But a contract of marriage is *sui generis*. It is simply introductory to the creation of a *status*, and what that *status* is the law determines. A contract executed in contravention of law may yet establish a *status* which the law will recognize, and, if one of the contracting parties were innocent of any intention to violate the law, may recognize as carrying with it in his favor the same rights

and duties as if the contract had been entirely unexceptionable. *In re Grimley*, 137 U. S. 147, 152, 153.

The common law of England followed the canon law in regarding a marriage once lawfully entered into as dissoluble only by an extraordinary act of the sovereign power. It followed the canon law also in holding marriages entered into by those under canonical disabilities to be voidable by the spiritual courts, and held them to be voidable only. They were therefore esteemed valid for all civil purposes, unless a sentence of nullity were pronounced during the life of both parties. Glanville, Book III, Chap. XVII; *Kenn's Case*, 7 Coke 138, 142. On the other hand, there were certain fundamental disabilities, depending not on the canon law but on universal or municipal law, which might render a marriage void *ab initio ;* such as a prior marriage of either party, a want of age sufficient to give capacity to consent, and a want at any age of the necessary mental capacity, 1 Blackstone's Comm., 434–439.

In the Revision of 1702, the General Assembly of this State prohibited marriages between those within certain degrees of kinship, and also the celebration of marriages without the publication of banns, and in case of minors, without the consent of the parent or guardian, or before one not having due authority. In case of a violation of the prohibition first mentioned the marriage was expressly declared to be null and void. For a violation of the others a pecuniary forfeiture was prescribed. Rev. of 1702, p. 74. In 1717 bigamous marriages were declared to be null and void, and those between parties under the age of consent.

Questions soon arose as to whether marriages celebrated in contravention of any of the prohibitions of the statute of 1702 could be treated as valid. That they could be, if the only objection was the want of the consent of parent or guardian, or a failure to publish the banns, was generally conceded ; but it was seriously doubted if one could be upheld which was celebrated before a person not duly authorized. To settle this point a provision was introduced into the Revision of 1821, following in part Lord Hard-

wicke's Act of 1753, expressly declaring such a marriage to be void. Rev. of 1821, 316, 318, note; General Statutes, § 4538.

The Act of 1895 did not (and General Statutes, § 1354, does not) make such a declaration with reference to the marriage of an epileptic. It contented itself with imposing criminal penalties. It inferentially sanctioned, in case of such a marriage, the living together of the parties "as husband and wife" after the latter arrived at the age of forty-five. The omission to declare the marriage to be void is made doubly significant by the fact that such a declaration is found embodied in two of the other statutory prohibitions (General Statutes, §§ 4534, 4538) and not in a third (§ 4535). It may well be that the General Assembly were no more inclined to bastardize the issue of the marriage of an epileptic than that of a minor, married without parental consent.

We therefore conclude that the legislature intended to leave the effect of a marriage contracted in violation of the Act of 1895 to be determined by the general principles of the common law. These lead to the conclusion that it is dissoluble, rather than void.

The common law, however, held that, when a marriage was avoided on account of canonical disabilities, it must be by a decree of nullity, which pronounced it void *ab initio*. This doctrine rested on the theory of the Roman Catholic Church, that if a marriage were once contracted under its sanction it acquired a sacramental character and was indissoluble by human authority. A spiritual court could adjudge that two parties, though apparently married, never really were: no court could dissolve what was in fact a marriage, for any cause. No such theory was ever recognized in the laws of Connecticut. Divorces have been freely granted from the first, and since 1667 one of the causes has been "fraudulent contract." This was judicially defined more than a century ago as a fraud entering into the substance of the marriage relation, preceding it; "and such a one as rendered the marriage unlawful *ab initio*, as consan-

guinity, corporal imbecility, or the like ; in which case, the law looks upon the marriage as null and void, being contracted *in fraudem legis*, and decrees a separation *a vinculo matrimonii*." *Benton* v. *Benton*, 1 Day, 111, 114. The words quoted were taken from Blackstone's Commentaries (III, p. 94) and accurately describe the original theory, as to divorce, of English law. That theory, however, is hardly consonant with the divorce statutes of this State. In the form in which they were incorporated in the Revision of 1702 (p. 28), these provide " that no Bill of Divorce shall be granted, to any Man or Woman lawfully Married, but in case of Adultery, or fraudulent Contract, or willful Desertion for three years, with total neglect of Duty ; or in case of Seven years absence of one party, and not heard of, after due enquiry is made, and the matter Certified to the Court of Assistants ; in which case the other party may be deemed and accounted single, and unmarried : and in that case, and in all other cases aforementioned, a Bill of Divorce may be granted by the Court of Assistants, to the aggrieved party, who may then lawfully Marry, or be Married again." In General Statutes, § 4551, fraudulent contract is described as an " offense " and made a cause of divorce, other provisions being made (§ 4562) for pronouncing a marriage void by a decree of nullity.

That the statute prior to our decision in *Benton* v. *Benton*, 1 Day, 111, was not regarded as limiting divorces on the ground of fraudulent contract to cases of marriages void *ab initio*, is evidenced by the following passages in the first general commentary on the laws of Connecticut : " The reasons of divorce by statute are such as arise subsequent to the marriage, excepting in the case of fraudulent contract. The issue, however, in no case will be bastardized by the divorce, because the marriage is legal and valid, till annulled ; not absolutely void, but only voidable. . . . By the common law of England, corporal imbecility, frigidity, or perpetual impotency, existing prior to the marriage was a ground of divorce from the bond of matrimony. In our statutes, nothing is mentioned of this reason, though perhaps

it may be comprehended under the idea of a fraudulent contract—for we cannot form an idea of a greater fraud, than for one person to marry another when labouring under a perpetual incapacity to perform the essential duties of the contract. But this point remains to be settled in future, as no application has ever been made on this ground to the superior court." 1 Swift's Sys., 192, 193.

The point adjudged in *Benton* v. *Benton*, 1 Day, 111, was that it was no cause of divorce that the man had proposed marriage professedly for love but really to get release from confinement on bastardy process which had been sued out by the woman, and with the design (afterwards executed) of deserting her forever as soon as the marriage was performed. That fraud and false representations of such a kind do not make out a case of fraudulent contract is clear; but the expressions above quoted from our opinion were unguarded in so far as they could be understood as limiting the application of that term to marriages of such a kind as were void *ab initio*.

If by the common law of England, at the time of the settlement of this country, fraudulent contract would be a cause of nullity and not of divorce, the legislation of Connecticut has been shaped by a different policy and leads to a different result. Looking, as our fathers did, on marriage as a civil institution, it was not to be expected that they would follow the mother country in accepting a doctrine which, in placing divorce beyond the reach of civil government, naturally led to giving the widest possible scope to decrees of nullity obtained in the ecclesiastical tribunals. American legislators, working with a free hand, could pay more regard to the interests of injured parties and the protection of the issue of an illegal marriage from the stain of illegitimacy.

The memorandum of decision filed by the court below shows that it felt bound by the decision in *Benton* v. *Benton*, 1 Day, 111, to rule that the cause of divorce claimed by the plaintiff did not come within the scope of the term " fraudulent contract," because it was not one rendering the mar-

riage void *ab initio*. This ground is untenable. The fraud which makes the contract of marriage fraudulent, as that word is used in the statute of divorce, is a fraud in law and upon the law. Such a fraud is accomplished whenever a person enters into that contract knowing that he is incapable of sexual intercourse, and yet, in order to induce the marriage, designedly and deceitfully concealing that fact from the other party, who is ignorant of it and has no reason to suppose it to exist. Whether such incapacity proceeds from a physical or a merely legal cause is immaterial. The prohibition of the Act of 1895 fastened upon the defendant an incapacity which, if unknown to the plaintiff and by him fraudulently concealed from her with the purpose thereby to induce a marriage, made his contract of marriage, in the eye of the law, fraudulent.

Whether, on such a state of facts, he could ask for a divorce, or would be precluded from thus taking advantage of his own wrong, we have no occasion to determine. The plaintiff could. The Superior Court has power to pass a decree of divorce from the bonds of matrimony in favor of a party to a marriage, not an epileptic, who has been tricked into it by the other party, who was an epileptic, through his fraud in inducing a belief that he was legally and physically competent to enter into the marital relation and fulfil all its duties, when he knew that he was not. *Guilford* v. *Oxford*, 9 Conn. 321, 328 ; *Ferris* v. *Ferris*, 8 id. 166.

Whether the facts found by the court were sufficient to support a judgment in her favor we do not think it necessary or proper to determine upon the present record. The finding was prepared under a misconception of the law, which naturally made it less full and precise on certain points than it would otherwise have been, and the case is of such a character that a rehearing will best serve the interests of justice.

There is error and a new trial is ordered.

In this opinion TORRANCE, C. J., HALL and PRENTICE, Js., concurred.

HAMERSLEY, J. (concurring in the result). The complaint contains under the form of two counts two statutory applications; the first, asking a decree declaring said marriage void and an order giving the petitioner custody of the illegitimate child and assigning to her a portion of the pseudo-husband's estate in pursuance of an Act first passed in 1877 and appearing as § 4562 of the General Statutes; and the second, for a divorce from a valid marriage on the ground of fraudulent contract, in pursuance of an Act first passed in 1677 and appearing in the General Statutes as § 4551, claiming custody of the child, alimony, and a change of the petitioner's name to her maiden name.

Upon an *ex parte* hearing the plaintiff claimed and asked the court to rule: (1) that the marriage was void by reason of the provisions of an Act passed in 1895 (Public Acts of 1895, pp. 667, 710), and therefore upon a decree declaring the marriage void she was entitled to an order for custody of the child and a portion of the respondent's estate; or, if the marriage was not void but valid, (2) that the plaintiff, being lawfully married, was entitled to a divorce on the ground of fraudulent contract. The court ruled (1) that the marriage was lawful, and denied the application for a decree declaring it void; (2) that the facts stated in the application for a divorce could not as a matter of law be so proved as to justify a divorce on the ground of fraudulent contract, and denied the application for a divorce; and the errors claimed in each of these rulings are the only reasons of appeal assigned.

We all agree that the court did not err in denying the application for a decree declaring the marriage void, as claimed upon the allegations of the first count, and that in denying the application for a divorce as claimed upon the allegations of the second count, because these allegations could not as a matter of law be so proved as to justify a divorce on the ground of fraudulent contract, the court did err. These conclusions cannot be said to be free from doubt, and involve questions of importance now brought before us for the first time. It may be doubtful if our conclusions could

be justified if they rested only on the grounds stated in the opinion as delivered; and certainly the novelty and important implications of the subject demand that no ground that may tend to make clear the true meaning of our decision, and to justify its correctness should be overlooked. I therefore deem it necessary in concurring in the result to state some additional reasons in support of our conclusions.

*First.* We hold that § 1 of the Act of 1895 does not render the marriage in question void. The opinion supports this conclusion by referring to the practice of our State, as indicated by its legislation, not to treat as void a marriage contracted in violation of a statutory command, for which violation the statute imposes a penalty, unless the statute imposing the penalty contains a specific clause of nullity; by referring to the settled principle of law that marriage is a *status* fundamental in its nature and essential to organized society, to which the State is also a party; *Steele* v. *Steele*, 35 Conn. 48, 53; *Seeley's Appeal*, 56 id. 202, 205; that although marriage may involve some antecedent agreement and requires the voluntary assent of the parties, it is not in the ordinary meaning of the word a contract, and in so far as it may partake of the nature of a contract it is absolutely *sui generis;* and that a violation of regulations established by law and enforced by penalties, as to the manner and circumstances of contracting a marriage and the condition of the parties at the time, does not render an appropriate form of marriage, between parties capable of assent, void, unless the law prescribing the prohibition and imposing the penalty clearly expresses the legislative will that such an attempt to enter upon the marriage relation shall be an absolute nullity. *Parton* v. *Hervey*, 1 Gray (Mass.) 119; 1 Bish. on Mar. & Div., §§ 308*b*, 283–287*a*, 306*a*. These considerations are of weight in determining the question whether § 1 of the Act of 1895 does clearly express the legislative will that a form of marriage in violation of its express prohibition shall be a mere nullity; but may fall short of settling that question. If § 1 were all of the Act it might be difficult to affirm that

—in saying a man and woman who were within the prescribed description shall not intermarry nor live together as husband and wife, and the persons violating or attempting to violate these provisions shall be imprisoned in the State prison not less than three years—the legislature did not clearly express its will that such a marriage should be a mere nullity, notwithstanding it did not follow a former practice of expressing its will through a specific clause of nullity. But § 1 does not stand alone : its meaning depends upon the other provisions of the Act, and the soundness of our conclusions may depend upon the effect of these other provisions in modifying the expression of legislative will which might otherwise seem apparent in § 1. An examination of the whole Act is necessary to the conclusion that the legislative intent to make the marriage in question void, does not appear from all the provisions of the Act to be certainly expressed ; and such examination will support that conclusion.

At the time of this marriage each of the parties was able to perform the ordinary mutual obligations involved in marriage ; each was capable of giving the assent requisite to a valid marriage. The Act does not declare either party to be incapable of marriage, but recognizes the ability of each to marry another person, as well as to marry each other. Persons such as the plaintiff and defendant, after the passage of the Act, remained as such persons ever before had been, capable of intermarriage ; but the Act punishes them for an exercise of this capacity at the time or under the circumstances mentioned ; that is, while the man is subject to the disease, or before the woman attains the statutory age. The motives that may have suggested this legislation cannot be affirmed. Its origin and history, as shown by public records and files, would indicate that a controlling motive may have been the hope of restraining an unnecessary increase of the helpless persons who are a charge upon the State, through severe punishment of sexual intercourse with paupers and other dependent persons. But whatever the motive or combination of motives may have been, the legal effect of the Act must be found from its language. The Act is one " con-

cerning Crimes and Punishments"; it treats persons who are epileptic, imbecile, or feeble-minded, as belonging to the same category of dependent persons as paupers, and imprisons in the State prison for not less than three years (1) "every man who shall carnally know any female under the age of forty-five years who is epileptic, imbecile, feeble-minded, or a pauper"; (2) "every man who is epileptic who shall carnally know any female under the age of forty-five years"; (3) "every female under the age of forty-five years who shall consent to be carnally known by any man who is epileptic, imbecile, or feeble-minded" (p. 667); and declares that these three provisions shall not affect "the mutual relations of any man and woman lawfully married" (p. 710). Married persons are not included within the subjects of these punishments, and the penalties cannot be extended to them by implication. It cannot be presumed that the legislature, in imposing a penalty upon any man who has carnal knowledge of a female who is a pauper, intended to punish every man who has done any act whereby he and his family may come within the designation of paupers, for each act of sexual intercourse with his wife,—and no distinction can properly be drawn in this respect between the punishment of carnal knowledge of a pauper and the other acts of carnal knowledge mentioned—especially in view of the amendment, passed at the same session, which provides that none of the punishments prescribed by the Act shall affect the mutual relations of any man and woman lawfully married. In forbidding certain persons of the dependent class described, who are punished for each act of illicit intercourse, from marrying each other, and prescribing against those who in fact intermarry a like penalty, the Act in its first section imposes a violent restraint upon marriage between the persons described, but impliedly recognizes the validity of the marriage in fact entered into by such persons who are not restrained through fear of incurring the prescribed penalty. If the intention of the legislature were to make the marriage void, there would be no occasion for inflicting upon persons who go through an innocuous form the same penalty they

will incur for each act of subsequent intercourse. The Act creates crimes heretofore unknown to the law, and its language in several places is of uncertain meaning; and in view of all its provisions the first section of the Act, read in its relation to the other provisions, may reasonably be construed as proscribing persons under the circumstances described from marrying, and punishing them for a violation of the proscription, and intentionally refraining from making void such a marriage actually consummated, according to the prescribed forms of law, through the mutual assent of persons capable of giving the requisite assent. This construction is not only reasonable, but, on the whole, seems the most reasonable interpretation of the legislative will as expressed in the Act, and does not require the application of the rule of strict construction. But an Act, creating and punishing crimes in the nature of felonies, which inflicts upon youthful fornication when aggravated by the circumstance of feeble-mindedness or poverty of one of the parties, a punishment more severe than can be inflicted for manslaughter, and equal in possible severity to that prescribed for an attempt at murder, may properly call for some strictness in construction. In view of all these considerations our decision that a marriage made in violation of the prohibition of § 1 of the Act of 1895 (which is in other respects lawful) is a valid and not a void marriage, appears to rest on solid ground.

*Second.* We hold that it is legally possible, under the allegations of fact in support of the application for a divorce as contained in the second count of the complaint, to prove a state of facts that will justify a divorce on the ground of " fraudulent contract." The validity of a judgment granting a divorce for this cause has never been challenged in this court but once, and this was in 1803. *Benton* v. *Benton,* 1 Day, 111. The facts stated in the petition in that case were palpably insufficient to justify a divorce under any possible construction of the law, and the court correctly so held. The court, however, in a *per curiam* opinion, evidently confused the " fraudulent contract " which our law treats as a wrong inflicted in the contraction of a lawful marriage en-

titling the injured party upon its discovery to a divorce, with the word "fraud" as used in the English law in justification or explanation of the jurisdiction exercised by ecclesiastical courts to pronounce, through a decree of nullity, a marriage, where the canonical impediments to marriage existed at the time of its celebration, to be void *ab initio* as being contracted *in fraudem legis;* and so limited the meaning of fraudulent contract, as a ground of divorce, to cases where fraud had been practiced in concealing the existence at the time of the marriage of one of these canonical impediments. Since *Benton* v. *Benton,* there is no instance of a divorce granted on the ground of fraudulent contract, except in a case referred to by Judge Dutton in his edition of Swift's Digest as decided in the Superior Court for Litchfield County in 1848, and which he cites as inconsistent with the *dictum* in *Benton* v. *Benton.* 1 Sw. Dig., 22. The opinion in the present case—after calling attention to the manifest error in this *dictum,* and to some of the reasons for holding that the trial court, acting under the wrong impression that the *dictum* in *Benton* v. *Benton* is binding, erred in ruling that the cause of divorce claimed by the plaintiff did not come within the scope of the term "fraudulent contract" because it was not one rendering the marriage void *ab initio*—places our decision, that the cause of divorce claimed by the plaintiff may come within the ground called by our law "fraudulent contract," upon the affirmation that the prohibition of the Act of 1895 fastened upon the defendant a legal incapacity for sexual intercourse, and that this incapacity, if unknown to the plaintiff and fraudulently concealed from her by the defendant for the purpose thereby to induce a marriage, made his contract in the eye of the law fraudulent. Assuming that a woman, after marriage to a man who, with a permanent physical incapacity for sexual intercourse, fraudulently deceived her as to this condition, may successfully charge her husband with the offense of fraudulent contract and obtain a divorce on that ground, it is clear that this defendant, who is admitted to be the father of the plaintiff's child, does not suffer from this incapacity.

Gould *v.* Gould.

It is also certain that no law can fasten upon a man a physical incapacity of this kind; and that the law of 1895 does not fasten upon the defendant a legal incapacity; that is, does not make it illegal for him to have intercourse with his wife. We hold that the Act does not invalidate this marriage, or any marriage of a like nature. The parties may be punished for a violation of law in marrying; but married, the marriage is valid and the mutual relations of husband and wife are not illegal. The real ground of our decision is, that when a man, in the physical condition in which the defendant is alleged to have been, has falsely misrepresented his state of health, and has thus fraudulently induced the marriage, a condition between the parties may result as truly inconsistent with the continuance of the marriage relation as if the subject of the fraudulent representations had been a permanent impotency; and that for either of such wrongs the injured party may have a divorce on the ground of fraudulent contract. To fully sustain this decision, it is necessary to determine the meaning of " fraudulent contract " as used in our divorce law, a question which has never been settled by this court.

Connecticut was founded during the progress of the struggle concerning principles of religious and political freedom which extended from the reign of Henry VIII. to the commencement of the 18th century; and was settled by men who largely shared the views of the more advanced reformers in that struggle. These men had the courage of their convictions in establishing a new government; and views which remained in England a subject of hot controversy and were never settled except in a compromising way, were in Connecticut incorporated into the structure of the social order and became the foundation on which some of our subsequent legislation and law rest. Especially is this true of the controversy concerning marriage and divorce and the relation of marriage to state and church. The views of the English reformers may be found in a work entitled " *Reformatio Legum Ecclesiasticarum,*" published in the reign of Elizabeth. The plan herein detailed almost wholly altered the law of

marriage and divorce, and included the following particulars : the binding nature of any precontract to marriage was abolished, and the actual entering upon the marriage state in the manner prescribed by statute was called the marriage contract. Marriage was valid, notwithstanding secret inability for the marriage state in either party, if the inability was known, but not otherwise. Marriage contracted under the influence of force or fear was void. The law of God as stated in Leviticus fixed the degrees within which marriage was prohibited, and could not be dispensed with by the head of the church. Marriage was indissoluble by the parties but was dissoluble on grounds authorized by law, after which remarriage might take place. Remarriage was authorized to the innocent party when the other persistently withdrew and refused to cohabit; in the case of long absence unheard of ; of irreconcilable enmity shown by one plotting the other's destruction, or by a husband treating his wife cruelly, or by the wife becoming obstinate or rebellious. The ecclesiastical device of separation *a mensa et thoro* was abolished. 4 Reeve's History of English Law, p. 549 *et seq.* (Chap. XXXII). The influence upon the action of our first settlers, of this quasi-authoritative statement of the views of the English reformers, is distinctly traceable and in many ways explains their action, which however was far more radical in that they wholly excluded all spiritual and ecclesiastical jurisdiction of marriage and divorce and threw off, as JUDGE SWIFT expressed it, " those shackles " of the ecclesiastical court. 1 Swift's Sys. 184, 185.

Immediately after the establishment of the jurisdiction of Connecticut by the fundamental orders of January 14th, 1638, marriage was taken under the exclusive jurisdiction of the civil authority, to be celebrated only by a magistrate, and no clergyman was authorized to join persons in marriage until 1694, and in the execution of this express authority he acted as the agent of the State (1 Col. Rec. p. 48 ; 4 id. p. 136), and this policy remains unchanged. 1 Swift's Sys. 184; *Goshen* v. *Stonington*, 4 Conn. 209, 218; *Dennis* v. *Dennis*, 68 id. 186. The General Court, in which the legis-

lative as well as the executive and judicial power was vested, while holding the marriage contract or "solemn covenant" of marriage to be not a mere agreement but a life relation entered upon in pursuance of the ordinance of God and indissoluble at the will of the parties, affirmed the relation to be dissoluble by authority of the State for such causes as seem to the legislature to render a continuance of the relation inconsistent with its essential purpose and against public policy, and commenced to grant legislative divorces at a time when the exercise of a similar power by the Parliament of England was warmly contested. 13 How. State Trials, 1334. Some nine or ten of these divorces appear to have been granted by the General Court between 1655 and 1677. 1 Col. Rec. pp. 275, 301, 362, 379; 2 id. pp. 129, 292, 293, 322, 326, 327. It also appears that the General Court permitted the Court of Assistants, which consisted of the magistrates of the General Court sitting for the trial of causes, to receive and hear petitions for divorce. One Elizabeth Rogers, wife of John Rogers, brought her petition for divorce to the Court of Assistants in 1675, which held it under consideration until 1676, when it referred the conclusion to the General Court; and that court, having considered the petition with all the allegations and proofs, found just cause for a divorce and did "free her from her conjugal bond to the said John Rogers," and the following year (1677) ordered that her temporary custody of the children be made permanent and that he pay her for their maintenance the sum of £20. The allegations in the petition include the charge of false representations by John Rogers as to himself, and it would seem, from the action on the custody of the children, that these false representations might cover a fraudulent concealment of the fact that he was a settled heretic, a fact certainly at that time deemed inconsistent with and destructive of the essential purposes of the marriage covenant. Rec. of Court of Assistants, I, 20, *et passim* Crimes and Misdemeanors, I, 74, *et passim;* 2 Col. Rec. pp. 292, 326. It is not without significance that within a few days after the final action on this petition, which included,

among its reasons for divorce, misrepresentations by the husband inducing a marriage which operated as a fraud upon the wife, and resulted in a relation between the parties thus married inconsistent with the essential purposes of that relation, and due in part to the condition of the husband which had been the subject of his misrepresentations, the General Court or Assembly enacted our first divorce law in the following language: "It is ordered by this court that no bill of divorce shall be granted to any man or woman lawfully married but in case of adultery, fraudulent contract, or willful desertion for three years with total neglect of duty, or seven years' providential absence being not heard of after due enquiry made and certified, such party shall be counted as legally dead to the other party; in all which cases a bill of divorce may be granted by the Court of Assistants to the agrieved party who may then lawfully marry or be married to any other." 2 Col. Rec. p. 328.

These proceedings during the forty years following the establishment of our early government settled our policy in relation to marriage and divorce, and the law then established remains substantially unchanged to-day, except by the addition of the grounds of divorce, in 1843, of habitual intemperance and intolerable cruelty, and later, of imprisonment for life and imprisonment for an infamous crime involving a violation of conjugal duty. General Statutes, § 4551. This policy included the absolute exclusion of spiritual control in the law of marriage and divorce, and of all ecclesiastical jurisdiction, with the rules and devices incident and peculiar to 'that jurisdiction as administered in England; the validity of every marriage actually entered into by competent parties (unless under circumstances which by the prescribed law render the form of marriage an absolute nullity), with the consequent exclusion of the possibility of a voidable marriage; the dissolubility of the bond of marriage by authority of the legislature, and the relegation of this power to the Superior Court, to be exercised upon finding a state of facts to exist which brings an application

for divorce within one of the grounds of divorce as defined by the legislature.

Looking at our divorce law in the setting of its original enactment, the meaning of its terms is cleared of some obscurity. We see that fraudulent contract, like adultery and malicious desertion, is an offense or a wrong done by one spouse to the other so affecting the essential conditions of the marriage *status* as practically to destroy that relation and render the continuance of the bond an injury to the State as well as to the parties. The wrong becomes complete in the completion of the marriage contract, that is, the celebration or actually entering upon the marriage state by which the two are joined as one in the " solemn covenant " or *status* of marriage. The wrong may arise in false statements as to existing facts which affect one or more of the essential purposes of the *status*. The injured spouse may condone the injury and accept the relation thus shorn of its full purpose, or upon discovery of the wrong may apply for a divorce. Each particular way in which this wrong may operate to defeat the essential purposes of marriage, and each particular mode in which the offender may consummate his fraud, cannot be covered by any general statement. The purpose intended in making fraudulent contract a ground of divorce is sufficiently clear, as it is in making intolerable cruelty and habitual intemperance grounds of divorce, and it may be affirmed of the former, as we said of the latter, the terms are such as cannot well be defined in advance. " They must be applied by the trier to cases as they arise, by inclusion or exclusion." *Dennis* v. *Dennis*, 68 Conn. 186, 192. There must be a deception in respect to some fact whose existence or nonexistence may affect in some certain way the very essence of the marriage relation, resulting in a lawful marriage which practically operates as a fraud upon the deceived spouse; and the existence or nonexistence of the fact thus concealed or misrepresented must operate, as between the parties to the marriage, to prevent some essential purpose of marriage and work a practical destruction of that relation. The effect of the wrong

upon the injured spouse may be similar in kind to that of other offenses which are made grounds of divorce; an effect upon the husband and the marriage relation, very similar to that of adultery, follows, when directly after marriage the husband discovers his wife to be pregnant with a bastard child and that she entered upon the marriage with him in this condition, fraudulently concealing from him the fact; and so in the case mentioned as cited in Swift's Digest, the Superior Court, acting upon consultation with the judges of this court, held that the wife was guilty of the offense of fraudulent contract. So where there exists a physical condition of one affecting the possibility of sexual intercourse, or the possibility of begetting children, a similar result may follow the fraudulent concealment of such fact. It is unnecessary to pursue the inquiry as to the possible conditions from which this wrong resulting in the offense of fraudulent contract may arise; it is sufficient to indicate the general principles which must control the examination of a particular case. In administering the law in an application upon this ground as well as upon other grounds of divorce, the court is necessarily clothed with a certain legal discretion. *Dennis* v. *Dennis*, 68 Conn. 186, 196, 197; *Morehouse* v. *Morehouse*, 70 id. 420, 426, 427; *Allen* v. *Allen*, 73 id. 54, 56. It is evident that the ground of fraudulent contract is one not likely to be often presented to a court. Such infamous deception in entering upon the marriage state is not common. The law authorizing a divorce, where such deception has been practiced, in a way executes itself by rendering improbable any successful result to the wrong-doer. In some cases the injured spouse may prefer to condone the wrong, and in most cases the person capable of the offense is likely to furnish other grounds of divorce more easy of proof. It is therefore not so strange as at first thought it might seem, that during the two hundred and twenty-five years that divorce has been permissible upon the ground of fraudulent contract, few applications have been made and so far as known but one divorce has been granted on that ground.

Applying these considerations to the present case, it is apparent that it may be possible for a man suffering from certain forms of epilepsy to so fraudulently misstate and misrepresent his physical condition that the woman thereby induced into a marriage, lawful though practically operating as a fraud upon her, may find herself in a similar relation to this man as if the fraud had been practiced in respect to actual physical impotency, or as if a husband had been fraudulently deceived into a marriage with a woman pregnant with a bastard child; and such wrong may work a similar practical destruction of the marriage relation and justify a divorce on the ground of fraudulent contract. In view of these considerations, the correctness of our decision, that under the allegations in the application for divorce it was possible for the plaintiff to prove a state of facts which might justify a divorce on the ground of fraudulent contract, becomes apparent. The record may indicate that the evidence before the trial judge tended to negative the fraud alleged and to point to a condonation by the plaintiff; but in view of all the circumstances and the evident misunderstanding under which the hearing was conducted, it may not unreasonably be held that the plaintiff ought not to be precluded from another trial by a judgment based on an erroneous view of the law.

As we hold that the Act of 1895 does not invalidate a marriage made contrary to its prohibition, and as the provisions of the Act neither require nor controvert our conclusion as to the meaning of fraudulent contract as a ground of divorce, it is evident that the observations in the opinion relative to the validity of that Act are uncalled for; and if they can be regarded as not wholly *obiter*, they do not seem to me to correctly meet any definite question. I must therefore dissent from this portion of the opinion. If this defendant had had intercourse with the plaintiff without marrying her, and for that act of illicit intercourse had been committed and sentenced to State prison for thirty years, as he might have been under the provisions of this Act, its constitutionality, upon appeal to this court,

would probably be questioned only by the claim that such a punishment for such an offense amounted to a cruel and unusual punishment. There is great difficulty in holding any law punishing an offense which is regarded as *malum in se* to be void, by reason of the severity of the punishment. If this plaintiff and defendant, immediately after their marriage had been arrested and each convicted and sentenced to imprisonment for thirty years, as they might have been under this Act, upon appeal from that judgment the question of validity would be presented in a different way. Here the offense is not *malum in se* : the act done by the parties, that of marrying, is not only a harmless act, but the exercise of a right belonging to every citizen, and the punishment is inflicted for exercising this right in a manner forbidden by law. It is evident that the nature and importance of the prohibition as related to the right it cripples or destroys, must determine the validity of the Act. Because parties to a marriage may be fined $100 for marrying without first obtaining a license, it does not follow that they may be hanged or imprisoned for life for that offense ; and because the inmates of a poorhouse, or persons who by reason of sickness, feeble-mindedness, or imbecility, are a charge or liable to become a charge upon the State, may be punished for marrying each other, it does not follow that every one who is sick or feeble-minded may be prevented from marrying. It is suggested that the Act may be treated as if it only punished married persons when one of them is epileptic ; but is this so? Section 2 provides that any selectman who countenances a marriage with any one who is epileptic, imbecile, or feeble-minded, or is a pauper, must be imprisoned for one year, and may be imprisoned for thirty years in the State prison. Is it not evident that all these words are related in their use, and that the force to be given any one cannot be ascertained except in its relation to the others? A person may be epileptic who has about him anything pertaining to epilepsy. He may be an intelligent, active man, or a helpless imbecile. The adjectives " imbecile " and " feeble-minded " are also used with an uncertain meaning ;

they clearly do not indicate an idiot, or a person *non compos mentis,* for such a person cannot marry by reason of his incapacity to give the requisite assent. Does the legislature mean by an imbecile or feeble-minded person one who has been reduced to a condition of imbecility or feeble-mindedness through epilepsy, or by an epileptic person one whose disease has taken the form of imbecility or feeble-mindedness? Is its meaning sufficiently clear to support the punishment inflicted? It is suggested that the legislature had in mind a bodily condition which often descended from parent to child. The provisions of the Act imply this; but the implication extends as well to the adjectives "imbecile" and "feeble-minded" as to the adjective "epileptic," and also to the word "pauper," and serves to add to the uncertainty of the precise fact which creates the crime for which the penalty is inflicted. No light is thrown on the situation, if, as suggested, this law, which has been on our statute books for ten years and so far as known a mere dead letter, untested and untried, has been copied with its impossible punishments and manifest crudity in the statutes of some other States. Repetition of this kind is no evidence of the quality or meaning of the Act. If the Act forbade marriages between persons who are living at the public charge and unable to support themselves, or between any clearly marked class of such persons, it might be sustained as restraining the dependent wards of the State from unnecessarily imposing burdens upon the public. *McCarthy* v. *Hinman,* 35 Conn. 538, 540. And if the prohibition were clearly limited to some definite class of dependent persons, it might be possible to sustain the Act. But in its present form there seems to be no certainty; we are dealing with a law which makes an innocent act a crime punishable by the most severe penalty; in such case the precise fact indicating the offense must be made clear and certain, and the court cannot exercise its ingenuity to create by implication from uncertain language a crime which has not been clearly defined. If we were now dealing with a sentence of this plaintiff and defendant to thirty years' imprisonment for marrying each other, we would

reasonably hesitate to sustain the validity of this Act in authorizing such a punishment for such an offense in language which so loosely and uncertainly defines the main fact essential to constitute the offense, unless indeed we used the power of construction to limit its meaning as above suggested. But such a prosecution is not before us, and the validity of the Act cannot well be presented in any other way, and certainly is not essential to our determination of this case. If the legislature had passed a different law, that is, one practically depriving a large number of citizens, as capable of marriage as any others, of the right of marriage with any person and under any circumstances, and involving the assumption of an arbitrary legislative power to select the persons in whose systems there may lurk any abnormal condition which may be called hereditary disease, and to exscind these persons from the ranks of manhood and citizenship for the possible benefit of a future generation,—a much broader question would be presented. The opinion seems to intimate that such a law would be regarded as expressive of the conviction of modern society that disease is largely preventible by proper precautions, and might therefore be rightly enforced even at the cost of what in former days was regarded as the proper domain of individual right; namely, the natural right of marriage, the freedom of contract in the exercise of the right, and freedom of conscience in the performance of the personal duties it may involve. This individual right has been and is regarded as protected by the Constitution from arbitrary invasion. These guaranteed rights may be restricted by appropriate regulations for the protection of the health, morals and safety of the public, but no one has yet dreamed that the limits of this field of protective legislation can be extended beyond the citizens of to-day so as to embrace the citizens of all future generations. It has been held that these guaranteed rights of personal freedom cannot be directly destroyed by legislation, merely because such destruction may be deemed to be generally useful, or to serve differing views of social and economic problems which are working their own solution inde-

pendent of legislatures and courts. *State* v. *Conlon*, 65 Conn. 478, 489 ; *Lochner* v. *New York*, 198 U. S. 45. It seems to me clear that the questions to which the intimations in this part of the opinion relate are open, grave, and doubtful ; and that no intimation, which unguarded language relating to these questions may suggest, can control or affect the serious consideration which we must give to the true relation of the constitutional guaranties of personal freedom to a legislative power to restrain by punitive prohibitions marriages which the legislators for the time being may deem to be unwise or improvident, whenever the resolution of that relation shall become necessary to the decision of a case before us.

As to the matters we have decided, I concur for all the reasons adduced in holding that there is no error in the judgment in so far as it denies the application for a decree declaring the marriage void, and that there is error in so far as it denies the petition for a divorce, and that this portion of the judgment must be set aside and another hearing on the divorce petition allowed.