## MARGARET A. NERINI
*vs.*
## PREMO B. NERINI

Superior Court      Hartford County      File No. 68640

MEMORANDUM FILED JANUARY 19, 1943.

*William Harney,* of Hartford, for the Plaintiff.

No appearance for the Defendant.

Memorandum of decision in action for annulment of marriage.

O'SULLIVAN, J.  Two months to the day after the parties to this litigation had intermarried, the plaintiff brought this action, seeking a decree, not of divorce, but one declaring the marriage null and void on the ground that through fraudulent representations as to his physical condition, her husband had induced her to wed him.  Nerini failed to enter an appearance and the matter was heard *ex parte*.  Nevertheless, the novelty of her claim has commanded the trier's attention to an unusual degree.  It is of the gravest public concern that the marriage tie should be permanently maintained (*Dennis vs. Dennis*, 68 Conn. 186) and when new theories destructive of this desirable characteristic are advanced, they should be examined critically and receive a court's approval only after it is satisfied of their legal soundness.  "When an attempt is made through the courts to undo a marriage, the State becomes in a sense a party to the proceedings, not necessarily to oppose, but to make sure that the attempt will not prevail without sufficient and lawful cause shown by the real facts of the case."  *Allen vs. Allen*, 73 Conn. 54, 55.

It appears that Nerini, when seven years of age, was subjected to an attack of osteomyelitis, which affected the bones of his right hip and ankle.  He was hospitalized in the Newington Home for Crippled Children, in which, as well as in another institution, he underwent several operations.  At the end of two years he was discharged as "well and with full mobility of the involved areas."  Now 30 years old, he has been employed as a lithographer by the Hartford Fire Insurance Company.  Sometime during 1940, a flare-up occurred in his ankle, but after incapacitating him for two weeks, it subsided.  Since his discharge from the Newington Home, this was the first and only occasion, prior to his marriage, upon which a recurrence of the disease made itself evident. I cannot accept that portion of the plaintiff's testimony that the defendant had been through a similar experience five years ago, in view of the history found in the record of a hospital to which he was admitted after his marriage.  However, this is of little moment and does not affect the problem which the case presents.

Each of the parties had known the other and the other's family for a long time.  During their engagement, which was one of three months, there had been a discussion about Nerini's health, for the plaintiff knew that he had been through an illness during some period of his life and that his condition at

that time had necessitated a few operations. He told her that, when very young, he had had blood poisoning, and when interrogated as to the possibility of its recurring, he replied that he had had no trouble for over 20 years and that "he didn't think it would happen again" and that he was cured "of whatever ailed him at the time." Had she known of the recurrence of the disease during 1940, the plaintiff would not have married Nerini.

The marriage took place on September 5, 1942, and thereafter it was consummated. One week later, Nerini began to feel ill, complaining of pain in his hip. This caused him to limp and then, to walk with great difficulty. Upon the advice of a doctor whom he consulted, he entered a hospital on September 15th. There he remained four days and was subjected to various medical tests. His condition was diagnosed as chronic osteomyelitis of the right ilium and hip joint. Returning home, he kept to his bed for a week. On the 26th, he visited his doctor, who, finding no local tenderness or swelling, discharged him. On October 4th, a subfascial abscess which was developing in his right thigh had become so painful that he re-entered the hospital where the abscess was incised and drained. No new osteomyelitis was discovered. He was discharged on October 29th.

The plaintiff had accompanied her husband to the hospital on October 4th. As she listened to him relate his history to a recording interne, she learned for the first time that in 1940 he had experienced a recurrence in the ankle of a childhood osteomyelitis. She then inquired why he had told her that his trouble was due to blood poisoning. He replied that he "never thought of what would happen" and that if anything was to occur, "he could always say it was probably something else." Immediately upon acquiring this hitherto unrevealed story of her husband's previous ailment in 1940, she severed all connections with him and on November 5th instituted an action to annul her marriage.

A preliminary question suggests itself which should be answered. It will be noted that the plaintiff is seeking an annulment of her marriage. Prior to 1939, this relief was not legally attainable, because the statute (Gen. Stat. [1930] §5188) conferring authority on the court referred only to *void* marriages, and, of course, a marriage contracted through fraud in any of its aspects is never void. Throughout our entire

history, we have recognized only four classifications of void marriages, namely, (1) those where the parties were within the forbidden degree of affinity or consanguinity; (2) those celebrated by unauthorized persons; (3) those of a bigamous nature; and (4) those wherein at least one of the parties had not reached the age of consent. *Gould vs. Gould,* 78 Conn. 242.

However, in 1939, the Legislature amended section 5188 to read: "Whenever from any cause any marriage shall be void *or voidable under the laws of this state or of the state in which such marriage was performed,* the superior court may....pass a decree declaring such marriage void." (Supp. [1939] §1316e).

In view of the change in the statute, as reflected by the italicized words, a decree may now enter nullifying a void-able marriage, that is to say, a marriage which one of the parties during the lifetime of both has, upon proper grounds, the option by court action to have declared void *ab initio.* *Ysern vs. Horter,* 94 N.J. Eq. 135, 118 Atl. 774. It follows that if Mrs. Nerini's marriage is voidable because of fraudulent representations, she is no longer limited to the relief of divorce; she may seek an annulment, and in a proper case it will be granted.

The real problem, then, is to determine whether the proven facts justify the nullifying of her marriage. One's reasoning must be predicated on the fact that she was deceived by her husband, and through this deception, was persuaded to wed. However, the effect of fraud is far more limited when a marital status is involved than it is when applied to the run-of-the-mill contractual relations of individuals. A contract of marriage is *sui generis* and lacks many of the incidents common to ordinary contracts. *Gould vs. Gould supra,* p. 245. For example, the power to dissolve, either by recission or release, is not available to the parties. A simple contract may be avoided by any material, inducing act of fraud, but the only fraud upon which an annulment may be based is that which not only is material and inducing but which affects the very essence of the marital status.

If every misrepresentation made by the wooer or the wooed were to pave the way to a courthouse for a disappointed spouse suddenly made aware of unsuspected and deliberately

concealed frailties of the other, society would indeed have reached a pretty pass. Shall the wife be entitled to nullify her solemnly accepted status if, forsooth, in the face of previous protestations to the contrary, her husband reveals himself as the possessor of a bewitching glass eye or a set of pearly false teeth, or shall to the husband be extended a similar privilege if his once-gorgeous blonde has mysteriously gone brunette? Of course not, for such fraud has not the slightest bearing on the objectives of matrimony. No Draconian law could or should be formulated to stop a man or a maid from pursuing during courtship the harmless deceptive arts to which both almost universally resort by wrapping themselves in an aura which is not strictly theirs to use. But after they have basked in borrowed light, when marriage comes, they take each other for better, for worse, for richer, for poorer, to cherish in sickness and in health. "The marriage relation is not to be disturbed for trifles, nor can the cumbrous machinery of the courts be brought to bear upon impalpable things....Fraudulent misrepresentations....as to birth,- social position, fortune, good health, and temperament, cannot therefore vitiate the contract. *Caveat emptor* is the harsh but necessary maxim of the law." 1 *Schouler, Marriage, Divorce, Separation and Domestic Relations* (6th ed. 1921) §23.

Speaking generally, the courts have adopted this doctrine. Of all, however, the British apply the sternest rule, for they refuse to annul a marriage no matter how base may have been the misrepresentation of one's moral qualities or physical fitness. *Moss vs. Moss,* Law Reports, Probate Division (1897) p. 263. A leading case on the subject in this country is *Reynolds vs. Reynolds*, 3 Allen (Mass.) 605. Speaking through *Bigelow, C.J.,* that court said (p. 607): "No misconception as to the character, fortune, health or temper, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. These are accidental qualities, which do not constitute the essential and material elements on which the marriage relation rests."

Other states have pursued a more liberal course. New York appears to have gone further than any other. This may be and probably is a reaction to the strictness of its divorce law. Indeed, New York takes the position, at variance with practically every other state, that marriage is to be viewed in no other light than that of any other contract, capable of

recission for every misrepresentation of a material, inducing fact. *Di Lorenzo vs. di Lorenzo,* 174 N.Y. 467, 67 N. E. 63.

The following are cases in which annulment has been denied for misrepresentations, the subject of the fraud being bracketed. *Wetstine vs. Wetstine,* 114 Conn. 7 (age, name, nationality); *Lindquist vs. Lindquist,* 130 N.J. Eq. 11, 20 Atl. (2d) 325 (previous chastity); *Hull vs. Hull,* 191 Ill. App. 307 (previous chastity); *Marshall vs. Marshall,* 212 Cal. 736, 300 Pac. 816 (social standing, wealth); *Oswald vs. Oswald,* 146 Md. 313, 126 Atl. 81 (not a divorcee); *Mitchell vs. Lloyd,* 126 Me. 503, 140 Atl. 182 (previous chastity); *Chipman vs. Johnston,* 237 Mass. 502, 130 N.E. 65 (social standing); *Heath vs. Heath,* 85 N.H. 419, 159 Atl. 418 (conviction for adultery); *Gordon vs. Gordon,* 11 Conn. Sup. 302 (criminal record). *Contra:* *Brown vs. Scott,* 140 Md. 258, 117 Atl. 114 (social standing); *Shonfeld vs. Shonfeld,* 260 N.Y. 477, 184 N.E. 60 (financial standing).

In addition to the foregoing, cases have arisen involving misrepresentations as to mental and physical fitness. The chief consideration, it seems to me, upon which the courts rely in reaching their conclusions in such instances, has been whether the misrepresentations have seriously interfered with the attainment of the physical objects of marriage, namely, intercourse and the birth of healthy children. Hence, it is almost universally held that concealment of a venereal disease is ample to warrant annulment. *Smith vs. Smith,* 171 Mass. 404, 50 N.E. 933; *Svenson·vs. Svenson,* 178 N.Y. 54, 70 N.E. 120; *C.... vs. C....,* 158 Wis. 301, 148 N.W. 865; *Crane vs. Crane,* 62 N.J. Eq. 21, 49 Atl. 734. A similar result has been reached where the representations involved epilepsy and hereditary insanity. *Gould vs. Gould,* 78 Conn. 242; *Jansa's Estate,* 169 Wis. 220, 171 N.W. 947. These two cases, however, were based on the existence of a statute forbidding the marriage of an epileptic. In jurisdictions lacking such a statute, annulment for concealed epilepsy has not been allowed. *Lyon vs. Lyon,* 230 Ill. 366, 82 N.E. 850. *See* annotation, 7 A.L.R. 1503.

The only other type of disease that appears in the cases is tuberculosis. *Sobol vs. Sobol,* 88 Misc. 277, 150 N.Y.S. 248; *Davis vs. Davis,* 90 N.J. Eq. 158, 106 Atl. 644. In each of these cases, which by the way were *nisi prius* decisions, the marriage was annulled on the theory that the health of the

petitioner was endangered and that the effect of the disease was to create its predisposition in children of the couple. No case has been unearthed involving osteomyelitis or any other disease save those commented on previously. This has its own significance. The absence of authority, even in such liberal jurisdictions as New York, is not to be ignored.

My conclusion on the law, then, is this: all misrepresentations concerning one's health and fitness are immaterial unless they involve the essentialia to the marital relation such as a physical impediment making impossible the performance of the duties and obligations of the relation or rendering its assumption and continuance dangerous to the health of the other spouse or capable of affecting the health of their offspring.

There is no credible evidence in the instant case that the defendant's condition falls within the foregoing statement. I question my right to take judicial notice of the effects of osteomyelitis, but were that power available, it would reveal that the disease is not contagious, hereditary, or incapacitating with respect to intercourse.

Nor is the plaintiff's claim convincing which asserts that her husband's deceit has tied her to a marriage with one who will be unable to provide her in the future with support. In the first place, there is nothing to establish that the disease will, in all probability, recur from time to time and thus prevent her husband from working for extended periods which may seriously affect his ability to support her. Nor, it might be added, is there any evidence as to the financial condition of Nerini. For aught that appears to the contrary, his financial resources may be such that he will be amply able to provide for his wife in the most lavish style without his doing another stroke of work the rest of his life. I am not convinced that a deception which involves one's ability to support his wife is an essential of the marriage contract, at least to the extent of employing it as a basis for an annulment. *Marshall vs. Marshall, supra.* But assuming that such a basis might furnish a proper ground, the absence of essential negative evidence in the instant case destroys the possibility of its application.

A petition for the annulment of any marriage requires great caution and demands clear proof. *Davis vs. Davis,* 119 Conn. 194, 203. The great responsibility that accompanies the dis-

·cretion reposed in this tribunal is not to be lightly tossed aside. Particularly heavy is this responsibility for a Connecticut court confronted with a case suggesting the need for a new, entering wedge of destruction into the most basic of human relations in civilized society. It is far better for society that this plaintiff should be disappointed in the object of her once-bestowed affections—unhappy as that lot may be—than to open a door through which the torrent may roar.

The petition is denied