## MICHAEL REYNOLDS vs. BRIDGET REYNOLDS.

This court has power, under Gen. Sts. c. 107, § 4, to declare a marriage void, into which a man was induced to enter by confiding in representations of the woman whom he took for his wife that she was chaste, when in fact she was with child by another man, if her husband repudiated her as soon as he had reason to know the fact.

LIBEL for a sentence of nullity of marriage, setting forth that the libellant was married to the respondent on the 11th of October 1856 ; that he was then only seventeen years of age, and the respondent was thirty years, or over ; that he had been acquainted with her for only about six weeks; that he was induced to marry her by means of her false and fraudulent representations that she was a chaste and virtuous woman, which he believed to be true; and that her friends with whom she then lived represented to him, at her procurement, that she was honest and virtuous ; but in truth she was not virtuous, but was at the time of the marriage pregnant with child by some person to the libellant unknown, of which child she was delivered on or about the 7th of March 1857, and the libellant did not thereafter live or have any intercourse with her.

51 *

The respondent filed a demurrer, and the case was reserved by *Dewey*, J., for the determination of the whole court.

*S. H. Folsom*, for the respondent.

*L. H. Wakefield*, for the libellant.

BIGELOW, C. J. The libel in the present case is the first one which has been brought under that provision of the statute enacted by *St.* 1855, *c.* 27, and reënacted by Gen. Sts. *c.* 107, § 4, which authorizes this court to grant a divorce where a marriage is supposed to be void, or the validity thereof is doubted, on the ground of fraud. It is quite obvious, from the terms in which the statute is expressed, that it was founded on the assumption that a marriage, into which one of the parties was induced to enter through the fraud and deception of the other, is null and void, and, like other contracts, may be annulled and set aside by the defrauded party. The statute does not provide that fraud shall vitiate a contract of marriage, but only confers an authority on the court to decree a dissolution of the marriage for such cause, as in other cases of nullity. Nor does it define or in any way prescribe the nature of the fraud, or the degree or amount of deception which shall be deemed to be sufficient to warrant the court in adjudging the contract to be void. This is left to be determined on general principles applicable to all contracts, subject only to such restrictions and modifications as necessarily arise and grow out of the peculiar nature of the contract of marriage. Indeed, it would be difficult if not impossible to lay down any general rule or definition which would comprehend all cases coming within the range of the legal import of the word fraud. A learned writer terms fraud *hydra multorum capitum.* An inquiry into the fraudulent intent and conduct of parties necessarily involves an investigation of facts; and as no two cases are precisely alike in their circumstances, it follows that the question whether fraud exists sufficient to vitiate a contract always depends very much on the nature of the transactions, the means of information possessed by the parties, and their relative situation and condition towards each other. The only general rule which can be safely stated is, that to render a contract void on the ground of fraud there must be a fraudulent

misrepresentation or concealment of some material fact.   What
amounts to such misrepresentation or concealment, and whether
the fact misstated or withheld is material, are questions to be
decided according to the circumstances developed in each case,
as it arises for judicial determination.

While, however, marriage by our law is regarded as a purely
civil contract, which may well be avoided and set aside on the
ground of fraud, it is not to be supposed that every error or mis-
take into which a person may fall concerning the character or
qualities of a wife or husband, although occasioned by disingen-
uous or even false statements or practices, will afford sufficient
reason for annulling an executed contract of marriage.   In the
absence of force or duress, and where there is no mistake as to
the identity of the person, any error or misapprehension as to
personal traits or attributes, or concerning the position or circum-
stances in life of a party, is deemed wholly immaterial, and fur-
nishes no good cause for divorce.   Therefore no misconception
as to the character, fortune, health or temper, however brought
about, will support an allegation of fraud on which a dissolution
of the marriage contract, when once executed, can be obtained
in a court of justice.   These are accidental qualities, which do
not constitute the essential and material elements on which the
marriage relation rests.   The law, in the exercise of a wise and
sound policy, seeks to render the contract of marriage, when
once executed, as far as possible indissoluble.   The great object
of marriage in a civilized and Christian community is to secure
the existence and permanence of the family relation, and to in-
sure the legitimacy of offspring.   It would tend to defeat this
object, if error or disappointment in personal qualities or charac-
ter was allowed to be the basis of proceedings on which to
found a dissolution of the marriage tie.   The law therefore
wisely requires that persons who act on representations or belief
in regard to such matters should bear the consequences which
flow from contracts into which they have voluntarily entered,
after they have been executed, and affords no relief for the re-
sults of " a blind credulity, however it may have been pro-
duced." *Ewing* v. *Wheatley*, 2 Hagg. Con. 175–183.   *Wakefield*

v. *Mackay*, 1 Phillimore, 134, 137, n. 1 Fraser's Dom. Rel. 230. Bish. Mar. and Div. §§ 100, 101. Nor is it unreasonable that each one should take on himself the burden of inquiring into representations concerning the character and qualities of the person whom he intends to marry, which, by the exercise of due caution and discretion, can be ascertained to be true or false, instead of lying by and using them to defeat a contract after it has become executed, and a portion of its fruits has been enjoyed. The only doubt which has arisen as to the wisdom or expediency of this doctrine has been occasioned by cases of ante-nuptial incontinence and want of chastity in females. It has been maintained by some writers, especially by commentators on the civil law, that chastity in woman is a quality which lies at the foundation of the contract of marriage, and constitutes one of its essential elements, and that any misrepresentation or concealment, by which a man has been led to believe that a woman whom he has married was chaste and virtuous, who, prior to the marriage, had been in fact defiled and debauched, was good ground for impeaching and vacating the marriage. Voet, 24, 2, 15. 1 Fraser's Dom. Rel. 231, and authorities there cited. But the better opinion seems to be that chastity stands on the same ground as other personal qualities; that there is nothing in the contract of marriage which implies that a woman shall have previously been pure and undefiled, or which renders unchastity prior to the execution of the contract an impediment to a valid marriage. It is doubtless true that in many cases the knowledge of such defect would prevent the consummation of the contract, and under certain circumstances might justify a man, while it was executory, in refusing to perform it. But a different rule applies when the contract has been executed. Nothing can then avoid it which does not amount to a fraud in the *essentialia* of the marriage relation. And as mere incontinence in a woman prior to her entrance into the marriage contract, not resulting in pregnancy, does not necessarily prevent her from being a faithful wife, or from bearing to her husband the pure offspring of his loins, there seems to be no sufficient reason for holding misrepresentation or concealment

on the subject of chastity to be such a fraud as to afford a valid ground for declaring a consummated marriage void. In regard to continence, as well as to other personal traits and attributes of character, it is the duty of a party to make due inquiry beforehand, and not to ask the law to relieve him from a position into which his own indiscretion or want of diligence has led him. Certainly it would lead to disastrous consequences if a woman who had once fallen from virtue could not be permitted to represent herself as continent, and thus restore herself to the rights and privileges of her sex, and enter into matrimony without incurring the risk of being put away by her husband on discovery of her previous immorality. Such a doctrine is inconsistent with reason and a wise and sound policy. Bish. Mar. and Div. § 105. *Scroggins* v. *Scroggins*, 3 Dev. 535, 544. 1 Fraser's Dom. Rel. 231. *Graves* v. *Graves*, 3 Curteis, 235. *Best* v. *Best*, 1 Addams, 411.

But a very different question arises where, as in the case at bar, a marriage is contracted and consummated on the faith of a representation that the woman is chaste and virtuous, and it is afterwards ascertained not only that this statement was false, but that she was at the time of making it and when she entered into the marriage relation pregnant with child by a man other than her husband. The material distinction between such case and a misrepresentation as to the previous chastity of a woman is obvious and palpable. The latter relates only to her conduct and character prior to the contract, while the former touches directly her actual present condition and her fitness to execute the marriage contract and take on herself the duties of a chaste and faithful wife. It is not going too far to say, that a woman who has not only submitted to the embraces of another man, but who also bears in her womb the fruit of such illicit intercourse, has during the period of her gestation incapacitated herself from making and executing a valid contract of marriage with a man who takes her as his wife in ignorance of her condition and on the faith of representations that she is chaste and virtuous. In such a case, the concealment and false statement go directly to the essentials of the marriage contract, and

operate as a fraud of the gravest character on him with whom she enters into that relation. As has been already stated, one of the leading and most important objects of the institution of marriage under our laws is the procreation of children, who shall with certainty be known by their parents as the pure offspring of their union. A husband has a right to require that his wife shall not bear to his bed aliens to his blood and lineage. This is implied in the very nature of the contract of marriage. Therefore a woman who is incapable of bearing a child to her husband at the time of her marriage, by reason of her pregnancy by another man, is unable to perform an important part of the contract into which she enters; and any representation which leads to the belief that she is in a marriageable condition is a false statement of a fact material to this contract, and on well settled principles affords good ground for setting it aside and declaring the marriage void.

This conclusion is strengthened by a consideration of the consequences which might result from a different doctrine. The rule of the common law is that if a man marry a woman who is with child, it raises a presumption that the child with which she is pregnant was begotten by him. This presumption is founded on the supposed acknowledgment of paternity by the subsequent act of marriage, and although such presumption is liable to be rebutted, yet in the absence of proof it stands. *Hemmenway* v. *Towner*, 1 Allen, 209. *Phillips* v. *Allen*, 2 Allen, 453. A man therefore who has contracted a marriage with a woman under such circumstances, if he could not obtain a divorce on the ground of fraud, would be subjected to the painful alternative of disowning the child, and thereby publishing to the world the shame of her who was still to remain his wife, or suffer the presumption of legitimacy to stand, and admit the child of another to share in his bounty and receive support in like manner as his own legitimate children. There is no sound rule of law or consideration of policy which requires that a marriage procured by false statements or representations and attended with such results upon an innocent party should be held valid and binding on him. An enforced union under such

circumstances would not tend to promote morality or give dignity or sanctity to the institution of marriage. On the contrary, it would tend to bring it into contempt, by compelling parties to continue in the relation of husband and wife after the basis of confidence and harmony has been taken away by the destruction of mutual respect and affection.

It is not to be overlooked, in the consideration of the question whether ante-nuptial pregnancy should constitute a sufficient ground of divorce, where it is unknown and kept concealed from the husband, and the marriage is contracted on the faith that the woman is chaste and virtuous, that the existence of the fact cannot be ascertained before marriage by any of the ordinary means of personal intercourse, or by careful and diligent inquiry. Nor would it be known after marriage in the earlier stages of gestation, nor even at a later period, where, as in the case at bar, the husband was immature and inexperienced. Such a case does not come within the principle which requires persons to act with caution, and after due inquiry concerning the personal qualities and character of those with whom they intend to contract marriage.

We do not mean to be understood as saying that pregnancy in a woman before marriage is a valid ground of divorce, where the husband, after having good reason to know the fact, continues his cohabitation and takes no immediate steps to repudiate his wife. Nor do we express any opinion concerning another class of cases which have arisen, where the pregnancy of the woman has been known to the husband and he has been induced to enter into the contract of marriage by false representations that he was the father of the unborn child. We confine our judgment to the precise case stated in the libel. Assuming the facts therein stated to be true, and that, on discovery of the fraud, the husband left the wife and took immediate steps to annul the marriage, we think he shows a sufficient ground to ask for a sentence of nullity of marriage. See *Morris* v. *Morris,* Wright, (Ohio,) 630. *Ritter* v. *Ritter,* 5 Blackf. 81. *Scott* v. *Shufeldt,* 5 Paige, 43. *Baker* v. *Baker,* 13 California, 87.

*Demurrer overruled.*