[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by virtue of writ, summons and complaint, which complaint was dated February 21, 2002, and filed with the court on March 22, 2002, and in said complaint, which was set forth in two counts, the plaintiff petitioner sought a dissolution of the marriage, and such legal and equitable relief to which the defendant may be entitled. To the complaint was attached the usual automatic orders as well as the return by Marshall Sullivan indicating in-hand service on the defendant.
The defendant appeared by counsel on March 14, 2002 and on the same date, March 14, 2002, the defendant filed an answer and a cross complaint answering count one and count two in the complaint and setting forth a cross complaint in which the prayer for relief sought a dissolution of the marriage, alimony, an equitable distribution of the marital estate and allowance to defend.
Apparently accompanying the cross complaint, the defendant by counsel filed a motion for attorney's fees pendente lite and a motion for temporary alimony pendente lite. These motions were acted upon by the court, Devine, J., on April 22, 2002 at which time the court directed that the plaintiff should pay to the defendant the sum of $75.00 per week as alimony pendente lite, the plaintiff to have exclusive use and possession of the marital residence and the alimony pendente lite to be paid by a contingent wage withholding.
On March 22, 2002 plaintiffs counsel filed an answer to the cross complaint.
On April 8, 2002 new counsel appeared for the plaintiff.
On April 15, 2002 the defendant served a request for disclosure and CT Page 14564 production on the plaintiff through counsel. Incident thereto, a financial affidavit was prepared and submitted by the plaintiff and on the same date a financial affidavit was filed on behalf of the defendant.
On May 6, 2002 the plaintiff filed a request for leave to amend the complaint and that request apparently having been granted, filed an amended complaint dated May 3, 2002 and the amended complaint set forth five counts. The first count claiming an annulment of the marriage. The second count claiming that the marital union had irretrievably broken down. The third count claiming fraud and deception on the part of the defendant. The fourth count claiming that the defendant lacked the requisite intent to enter into a marital relationship and misrepresented her intentions and the fifth count indicated that the marriage is void or voidable. No other pleadings were filed until time of trial.
The plaintiff and the defendant with their respective counsel appeared before the court on October 22, 2002 and October 23, 2002 and the matter was heard to a conclusion.
The court makes the following findings of fact.
Initially, due to the content of the file and the court's concern as to whether or not the defendant was, in all respects, conversant in the English language, the court made inquiry of the defendant and was satisfied with her responses as to her fluency with regard to the English language.
The defendant was born and for most of her life lived in the country of Lithuania. On July 7, 2001, the defendant joined the plaintiff in a marriage ceremony which occurred in the town of Kaunas, Lithuania. The defendant had first met the plaintiff on the Internet through an entity known as Kiss.com and there had been contacts as a result of that apparent dating service between the parties through e-mail and phone calls. The plaintiff and the defendant first physically met in person in Lithuania around Easter time 2001. As indicated, prior to that face-to-face meeting, there had been extensive exchanges by e-mail and phone conversations.
Friends and acquaintances in Lithuania had assisted the defendant in registering in this interclub network on which program she had embarked. The defendant's testimony was to the effect that by virtue of this course of action on her part, that she was not looking for a husband. The defendant acknowledged advertising so to speak in this Kiss.com organization and the very first initial contact between the plaintiff and the defendant was pursuant to email. CT Page 14565
The defendant apparently has some familiarity or competence in matters pertaining to computers for writing with the use thereof and or for accounting. The defendant indicated that she was able to, in her words, "run some computer programs in an Internet setting."
The defendant is age 32; having been born March 20, 1970 in Kaunas, Lithuania. The defendant described that country as having approximately 3 million people for its population. The defendant attended high school in Kaunas and subsequently medical school. The defendant learned and became conversant in the English language in high school. The defendant acquired mid-wife training which required instruction and training over a three-year period and the defendant became a registered mid-wife in Lithuania. The defendant, according to her testimony, worked for a period of six years's in a medical facility in the delivery room as a mid-wife and earned approximately 400 ruples a month. This occurring up until 1996. The defendant took other educational courses to improve her educational attainments. The defendant, as a mid-wife, is also apparently, according to the testimony, a registered nurse.
The plaintiff first physically came to Lithuania in April of 2001. Prior thereto, as earlier noted, there was fairly extensive contact consisting of phone calls three or four times a week between the parties. On the plaintiffs arrival in Lithuania, in the first instance, the defendant picked him up at the airport and at least for the first day the plaintiff stayed at the home of the defendant's aunt.
The defendant was, at an earlier point in her life, married and had a daughter incident to that relationship. After the initial stay by the plaintiff at the aunt's home, he then stayed with the defendant and the defendant's minor child at the same residence. Initially, the plaintiff stayed in Lithuania nine or ten days.
The testimony indicated that the parties discussed entering into a marital relationship. According to the testimony of the defendant, the plaintiff professed his love of the defendant in the presence of her parents. In due course, the plaintiff returned to the United States.
Later in June of 2001, the plaintiff returned to Lithuania. According to the defendant's testimony, the plaintiff represented to the defendant's mother that he was desirous of marrying the defendant. At this juncture, the defendant suggested to the plaintiff that they should not rush things or hastily enter into a marriage. There was apparently some discussion whereby the plaintiff indicated to the defendant that if they were to remove themselves to the United States that the defendant CT Page 14566 could subsequently return to Lithuania should she be so disposed. The defendant apparently indicated that she was willing to live anywhere. The defendant apparently has some friends, relatives or acquaintances that reside in the state of Ohio in the United States. The defendant's aunt who is an Ohio resident apparently is, according to the testimony, a United States citizen.
In 1995 the defendant had traveled to the United States and stayed in the home of a relative who lived in the United States.
When the plaintiff came to Lithuania in April of 2001, the testimony was to the effect that the defendant rented an apartment for the plaintiff and the defendant visited the plaintiff every evening at that location during the time frame in which he was in Lithuania. The plaintiff is not conversant in the language of Lithuania nor the language of Russia, which apparently is a language that is fairly closely allied linguistically with Lithuania.
The testimony was to the effect that as concerns a contemplated marriage that the defendant would only be allowed to enter into a marital union in her hometown in Kaunas, Lithuania. It was indicated that there was a three-week waiting period prior to a marriage being solemnized and that was pursuant to law in Lithuania. The defendant represented that at the time of the application for the license looking toward the subsequent marriage of the parties that she was pregnant. The defendant represents that she told the plaintiff of her condition and that according to her testimony his response was to the effect that this was "fine and we will have a baby."
Apparently, according to the testimony, the defendant suffered a miscarriage after two or three weeks of becoming aware of her condition. There was no medical evidence presented to the court during the pendency of the proceedings as concerns a verification or lack thereof as to that particular condition.
After the marriage of the parties on that day, which was conducted at a "castle," the parties went on a boat trip, a picnic and the defendant represents that she stayed the night with the plaintiff
The plaintiff returned to the United States approximately five days after the marriage ceremony and the parties communicated by phone thereafter.
On December 1, 2001 the defendant eventually came to the United States with her daughter. At that time, she had about $2,000.00 in American CT Page 14567 funds with her.
Prior to leaving Lithuania, the defendant, according to her testimony, had sold her apartment in Kaunas; the sale taking place apparently in November or December of 2001 prior to her coming to this country.
The defendant testified that she got her visa that would allow her to come on September 17, 2001.
When the defendant arrived at the airport, the plaintiff, although tardy, picked her up at the airport. The delay was caused by traffic congestion, according to the testimony.
There was testimony to the effect that after returning to the United States that the plaintiff had made a call to a consulate office expressing some dismay with regard to the inclinations of the defendant with regard to a marital partner. This created a problem for the defendant in her coming to this country and the court will touch upon the limited exhibits, one of which refers to this issue.
After coming to the United States in December of 2001, after a relatively short interval, the defendant left for a ten-day period going to see a relative in Ohio and then returned about Christmastime 2001 and then subsequently left permanently on January 2nd or 3rd, 2002.
The defendant's claim is that she suffered mental abuse and emotional cruelty.
In an unrelated matter, which is not before the court, the defendant indicated that she had retained counsel with regard to certain immigration problems that presumably presently beset her.
The defendant's testimony was to the effect that she sold her apartment, her automobile and other assets in Lithuania to come to this country in reliance upon the promises and representations of the plaintiff and the marriage ceremony that had occurred in Lithuania.
Upon arriving here, the defendant's claim was to the effect that the plaintiff wanted her to perform menial tasks of wide variety natures and that she was not treated as an equal but as someone only to do hard work, keep the home and matters of like nature.
The defendant acknowledged that there was no direct physical abuse and predicates her claim in part on emotional abuse. CT Page 14568
After the defendant had left in January 2002, she went to Ohio and apparently secured a position there as a home health aide at $10.00 an hour, varying hours of employment. Her weekly gross earnings during that period, according to the testimony, were $487.00 weekly gross.
On or about July of 2002, the defendant returned to Lithuania with her daughter to see her parents.
The defendant's present address is with an aunt in Ohio. The defendant's present employment consists of caring for an elderly lady in Ohio who is afflicted with Alzheimer's and according to her testimony, her weekly gross is about $200.00.
As earlier indicated, this is the second marriage for the defendant; having earlier been divorced from her first husband in which union there was one child; the daughter referred to.
Incident to that dissolution of marriage which presumably occurred in Lithuania, the defendant, according to her testimony, receives approximately $30.00 a month as alimony and support.
When the defendant first placed her notice in the entity known as Kiss.com, there was included in that a photograph of the defendant and a brief resume. The defendant acknowledged that she received some e-mail from that placement and when contacted by the plaintiff, according to her testimony, she was impressed with the fact that the plaintiff was a teacher, stating that in Lithuania, teachers and religious clerics are particularly highly regarded and respected.
The initial exchange of e-mails between the plaintiff and the defendant extended over a period of several months and incident to the Easter contact between the parties, that extended for apparently a period of about seven days. At that time, the defendant introduced her daughter to the plaintiff. The accommodations that were resorted to during that time frame apparently were quite limited, consisting of two rooms and the defendant's daughter occupying one of them.
The parties apparently discussed family backgrounds and matters of like nature.
According to the defendant's testimony, the plaintiff professed great loneliness and indicated that he was desirous of uniting in marriage with the defendant.
According to the testimony, the defendant spent almost every evening CT Page 14569 with the plaintiff while he was there but the parties did not apparently stay together all through the night.
According to the defendant, the plaintiff proposed marriage and gave the defendant an engagement ring. The required initial forms necessary in Lithuania were, according to the testimony, filled out jointly by the parties and the ceremony was conducted at an institution denominated as a castle, music was apparently provided for the occasion and the apparent two required witnesses were in attendance. These were relatives or acquaintances of the defendant. The ceremony was apparently conducted in the Lithuanian language and there was no interpreter present so the plaintiff represents that he could not be sure as to exactly what was being said and testified that he relied upon the translation provided by the defendant.
Prior to the marital union, the defendant went to Poland for the requisite preliminary tests required, blood test, etc., and to secure a visa. The defendant paid for these trips herself. The cost amounting to approximately $1,500.00.
When the defendant sold her apartment in Kaunas, Lithuania, she received $9,000.00, therefore claiming a loss on the sale because of her desire to dispose of the property before coming to the United States in the amount of $4,000.00. This, according to the defendant, because the plaintiff was pressuring her to come to the states quickly. The defendant also sold an automobile that she had, a 1996 Audi, for a modest amount, again claiming that the same was done hastily. The defendant left her job and position where, according to her testimony, she had received a fairly good compensation; at least according to the standards in Lithuania. The defendant at the time that she left her position was working for a medical supplies company and earned between $600.00 and $800.00 monthly at that position. The defendant was required to train her replacement at her position at Byoc, Lithuania before she was able to leave. The defendant is a communicant of the Catholic church and the some time complaint or accusation by the plaintiff as to her inclination in sexual matters is frowned upon in Lithuania. The defendant denied any such inclination.
By way of explanation to the defendant as to why he had called the consulate raising the issue of her sexual orientation, the plaintiff claimed that he had had a bad dream and that this caused him to make that call.
When the defendant did come to the United States after the marriage in December, she was held up for some time at the airport by the Immigration CT Page 14570 and Naturalization Service who took her papers. She was not released until the plaintiff physically appeared, provided a letter to the INS, which allowed her to remain.
The defendant's testimony was to the effect that there was a physical consummation of the marital union after the marriage and that in fact there had been a physical relationship which resulted, according to her, of her pregnancy prior to the marriage.
The defendant's testimony was to the effect that the plaintiff was a completely different person once she arrived here in this country.
It was the defendant's claim that the plaintiff, during the relatively brief interval when she came to the United States, ordered her to do all sorts of menial tasks and it was the defendant's claim that the plaintiff told her that he would not assist her in going to Hartford to retrieve her visa and other papers, which had initially been taken from her at the airport when she first came to the United States on which occasion the plaintiff was somewhat late in arriving due to traffic problems. The testimony by the defendant was to the effect that if she did not do the plaintiffs bidding that he would hamper her ability to retrieve the visa documents. The defendant claims that the plaintiff actually stated to her that she was in sort of an indentured status.
The plaintiff, according to the testimony, introduced the defendant as a neighbor to friends in the area and not as his spouse.
The defendant's claim was to the effect that there was little food in the home when she first came to the United States and that certain foods were treated by the plaintiff as being too expensive for purchase.
The defendant claimed that her daughter, issue of her first marriage, was frightened by the plaintiff and his attitude and conduct and that the child became depressed by virtue of the plaintiffs attitude toward the defendant.
The defendant's claim was that the plaintiff threw objects about the home and, as earlier indicated in the memorandum, no direct acts of physical violence to her person.
The defendant claimed that it took a long time for the plaintiff to give her a key to the home in which they were residing and that he would give her lists of work that were to be done; that he never showed any overt affection or kindness once she came to this country but according to the defendant, sexual intercourse was required. CT Page 14571
The defendant left the residence on January 3, 2002 and went to her aunt's home. The defendant characterized her state of mind as being depressed, not having been able to retrieve her visa and other allied papers, her daughter being sick and the defendant feeling trapped in the plaintiffs home.
A neighbor in the area by the name of Jennings apparently did help or assist the defendant and it was a member of the Jennings family that took the defendant eventually to the INS office in Hartford for the retrieval of her papers.
In February of 2002 the defendant found employment apparently in Ohio and subsequently the defendant arranged for her daughter to return to Lithuania because of the defendant's concerns for the child's stability. The child had been out of a school setting while here for a period of about 40 days and it was the defendant's claim that the plaintiff declined to assist the defendant in getting the defendant's daughter into a local school setting. On returning to Lithuania, the defendant's child stayed with her parents.
The defendant now resides in Ohio. Apparently, the child has in due course returned and now apparently attends a school in Ohio.
The defendant's claim is that she trusted the plaintiff and his representations and that trust was misplaced.
The defendant reaffirmed her physical state of pregnancy, as earlier noted in the memorandum, and claimed that in fact the condition existed.
The defendant is now occupying an apartment in Ohio where the rent is $550.00 a month for herself and her daughter. The defendant has acquired an automobile for which she paid $3,200.00. An earlier acquired motor vehicle was damaged in an accident and the monies for the vehicle were the result of insurance proceeds.
The plaintiff, Martin Brennauer, resides at 2 Smith Street in Pawcatuck. He has lived there since 1988. He owns the property on which there is a first and second mortgage. The plaintiff is 51 years old; date of birth, January 10, 1951. He is a high school graduate having graduated from South High School in Omaha, Nebraska. Subsequently, the plaintiff attended Mohegan Community College, graduated therefrom in 1976 with a degree in science. He spent later a year at the University of Connecticut in engineering studies. In 1980 the plaintiff received a Bachelor's Degree at Central Connecticut College. The degree being in technical CT Page 14572 education. The plaintiff is employed as a teacher at the Fitch High School where he has taught for 21 years. The plaintiff during that time frame taught at area schools other than Fitch.
The plaintiff characterized his health as subject to stress particularly with regard to the instant proceedings. The plaintiff represented that he suffered from a skin rash brought on by emotional upset. He is not presently on any regimen of medication.
The plaintiff recited how he first met the defendant and that the plaintiff himself had resorted to the Internet device known as Kiss.com. The plaintiff represented that he is not of the Catholic religious persuasion but nevertheless characterized himself as a religious person.
As indicated, the plaintiff pursued the ad that he observed as concerns the defendant and they exchanged e-mails, phone calls and so forth. The organization known as Kiss.com is apparently an Internet dating service or so regarded. The plaintiff paid $25.00 a month as a user fee for resort to this particular entity. The plaintiff had listed his profile and picture on the Internet incident to that service.
The plaintiff flew into an airport in Lithuania in April of 2002. Upon arriving there, as earlier noted, he was taken to the defendant's aunt's home and stayed there for one night. The cost to the plaintiff for the round-trip fare was $900.00. It is the plaintiffs position that he has never slept with nor been intimate with the defendant on either occasion of his traveling to Lithuania or once the defendant came to this country.
The plaintiff verified the attendance at the marriage ceremony, at the so-called castle, verified the subsequent visit to the festival, the boat ride and matters of like nature.
On his first visit to Lithuania, the plaintiff gave the defendant $150.00 to help her financially.
The plaintiff indicated that his intention in following through on the Kiss.com notice and traveling to Lithuania was to, in his words, find a good woman to be a wife.
It was the plaintiffs position that the defendant only stayed with him while he was in Lithuania on two-hour intervals.
The plaintiff indicated that it was a condition of the proposal and marriage ceremony that the defendant come to the United States. Neither CT Page 14573 the defendant's parents nor the defendant's daughter were at the wedding ceremony. The plaintiff indicated that he did not understand the words being spoken at the time of the ceremony in Kolnis, Lithuania but relied upon the translation provided by the defendant and no translator being in attendance was predicated apparently in part on the cost incident thereto.
It is the plaintiffs claim that the defendant's conduct extended even to refusing to hold hands in public and was reluctant to be seen in public with the two of them together.
It is the plaintiffs claim that the defendant never mentioned her claimed pregnancy nor the subsequent miscarriage.
The plaintiff indicated that he had told the defendant that she could have anything that she wanted incident to the contemplated marital relationship and her coming to the United States.
After coming to this country and after return by the defendant of a ten-day visit to Ohio, the defendant, when she left for good on January 2, 2002, gave no advance indication thereof to the plaintiff.
The plaintiff, in contrast to the testimony of the defendant, represented that he did his own laundry; that he cooked and prepared some of the meals; that he took the defendant and her daughter shopping; that he denies having ever referred to the defendant as a neighbor. The plaintiff has apparently regularly and faithfully paid the $75.00 weekly pendente Lite ordered by the court, Devine, J., and there is no arrearage.
The plaintiff testified that there was no possibility of reconciliation. There are of course no children issue of this marital relationship and there is no indication presented to the court that the defendant is presently with child. No assistance has been granted to either of the parties by the State of Connecticut or any town, city or community as best the court can devine.
The plaintiff represented that he had a good relationship with the defendant's child and he characterized that child as a wonderful child.
The plaintiff denied the defendant's claim of throwing any objects.
The plaintiff feels that the defendant has misrepresented her situation and has manipulated him. He makes no requests of any material nature of the defendant. CT Page 14574
During the proceedings, the court was requested by the defendant's counsel to judicially notice § 213 of the INS Regulations. The issue before the court however is one pertaining to an annulment of the marriage or a termination thereof on proper grounds. Any problem pertaining to the INS regulations would fall within the confines and preview of the Federal Code and the defendant represented that she has retained other counsel in that matter concerning any sponsors relative to the affidavit of support.
The defendant's child who is 10 years old is named Giedra.
The plaintiff acknowledged that at one point in time he did receive a copy of the claimed marriage certificate which was translated into English.
The defendant indicated that there were no problems in the union with regard to the immoderate use of alcohol, no drugs and the plaintiffs claim of course is that there were no instances of physical violence.
At the time of the defendant's first marital union, her testimony was to the effect that she was seven months pregnant at that time.
The defendant represented that the miscarriage that she sustained occurred toward the end of July in 2001 and that she was allegedly at that time approximately 13 weeks pregnant. The defendant also represented that she told the plaintiff of her condition over the phone during one of their conversations.
Review of Exhibits
Defendant's Exhibit 1 is a document entitled, "Ura's profile, Kiss.com," on which exhibit there appears a black and white picture of the defendant and sets forth some of her circumstances including age, height, weight, that she does not smoke nor drink, religion, that she has a child, that she has a university education and that she is divorced; that referring of course to her first marriage. The form says that she is looking for a soul mate.
Defendant's Exhibit 2 is a certificate of marriage; the first sheet thereof being in the Lithuanian language; the second page being in English entitled, "Certificate of Marriage," setting forth the names of the parties, dates of birth, the date of the marriage and where it took place and matters of like nature. The third page attests to the document as concerns its translation into English and is under what we would term CT Page 14575 in this country as a seal of a notary public.
Plaintiff's Exhibit A is a similar type of document entitled, "Romance Wizard Preferences, Kiss.com," again showing a black and white photograph of the defendant and setting forth certain data. It is the claim of the plaintiff that Defendant's Exhibit 1 is the document which he originally viewed on the Internet when the parties first met and that Plaintiffs Exhibit A reflects a state of affairs after the claimed marriage had occurred and the parties had separated. One of the items appearing on Plaintiffs Exhibit A had to do with the nature of the defendant's request with regard to a companion.
There were no other exhibits that were presented to the court.
From the financial affidavits of the parties, the court finds that the plaintiff is a teacher employed by the Groton Board of Education in Groton; that his gross weekly wage is $1,266.54; deductions for federal and State taxes, teacher's retirement fund, health insurance, a voluntary deduction and a home equity loan deduction resulting a total of $628.80 for a net of $628.80; weekly expenses shown as $691.17; debt to a sister of the plaintiff of $10,000.00 and a home equity loan of $10,000.00. The real estate at 2 Smith Street in Pawcatuck is valued at $105,000.00 with two mortgages thereon; one for $47,000.00 and one for $10,000.00 resulting in a $48,000.00 equity; a 1991 Nissan automobile valued at $1,500.00 free and clear; a 1990 Toyota pickup valued at $3,200.00 free and clear; household furnishings, $900.00; bank account, $800.00; another automobile, a 1991 Toyota Previa and a 14-foot aluminum boat valued at $1,750.00. No other assets.
The defendant's financial affidavit reflects her employment as that of a home aide, self-employed, presently employed by one Florence Dinallo in Mayfield Heights, Ohio; gross weekly wage, $200.00; deductions, $23.30 for a net of $176.70; weekly expenses, $575.29. The affidavit does not reflect the $75.00 a week that the defendant has been receiving incident to the pendente lite order by Devine, J.; debts to an aunt to the Jennings family, $5,250.00; no real estate; a 1994 Oldsmobile automobile valued at $3,200.00 free and clear; $270.00 in the bank; no other assets. The affidavit also does not reflect the alimony-support amount she receives as to her first marriage.
From the dissolution of marriage report form sometimes known as the Health Form, the court notes that this is the plaintiffs third marriage, the defendant's second. Apparently the two prior unions of the plaintiff and the one of the defendant were all resolved by way of a dissolution of the marriage. The form indicates that the plaintiff has a college CT Page 14576 education as does the defendant.
 Discussion
This is a marital union where the duration thereof is measured in weeks or months in terms of actual togetherness.
The court has touched on, in its findings of facts, the circumstances surrounding the defendant, her place of birth, her one prior marriage, the exchanges by and between the plaintiff and the defendant by e-mail and by phone, the registration by both of the parties with the dating entity known as Kiss.com.
The defendant is age 32. The court has touched on her education, her work and the state of her health. The court has also touched on the sale of such assets as she possessed before she left Lithuania to come to the United States.
As noted, the only witnesses presented to the court were the plaintiff and the defendant. On the basis of the testimony, and of course, credibility is a critical issue here, it would appear that the defendant followed a course in some respects somewhat similar to what might exist in the states by visiting Poland for blood tests, the passing of the requisite waiting period and so forth.
The exhibit of the marriage certificate in both Lithuanian and English would appear to be valid on its face and the admission of the certificate was an agreed exhibit by counsel for both sides.
On the basis of what was presented to the court, presumably the requirements for a valid marital union have been met in Lithuania. There was no evidence presented to the court as to the precise individual who performed the ceremony and that party's authority or ability to perform such an act.
Clearly, it would have assisted the court had there been other witnesses in this proceeding besides just the parties.
As noted, this was the third marriage for the plaintiff and the second for the defendant. Presumably therefore, the parties had some passing familiarity, even with the language barrier that existed, as to what was required incident to the parties being joined together in marriage.
If the plaintiff had serious reservations with regard to the words that were being spoken at the marriage ceremony, one might reasonably conject CT Page 14577 that it would have been prudent to have a translator there, responsible solely to the plaintiff so that he might fully appreciate the nature and content of the ceremony that was being performed.
The court has touched upon the fact that apparently there was no overt physical abuse, no immoderate use of alcohol and no drugs.
The time frame where the parties were actually together being quite limited, whether or not a sufficient time frame elapsed where emotional cruelty could be a proper and contributing factor in the breakdown of the marriage, query.
One of the things that concerns the court is whether or not either of the parties gave the union a fair opportunity to work and become a viable marital union mindful of the conduct on each side of the aisle.
As noted, the plaintiff is 51 years old. He is well educated. He is a teacher. No serious physical problems on either side of the aisle. What may have motivated the plaintiff to make the call to the consulate questioning the defendant's sexual orientation is a matter of conjecture.
The testimony between the parties with regard to a physical consummation of the union is clearly dramatically at issue. The defendant professing and claiming that in fact it took place and that actually prior to the joining of the parties' marriage that she became pregnant by virtue of the conduct of the plaintiff. All of this is vehemently denied by the plaintiff.
The defendant's counsel presumably intended to raise the specter of a financial responsibility incident to the defendant coming to this country and the plaintiff being financially responsible therefore in order that the defendant not become a public charge; however, that issue is best left in the hands of federal authorities and the defendant apparently has already retained counsel as to federal issues.
Counts one, three, four and five seek an annulment of the marriage on the following grounds, respectively: that the defendant had determined prior to the marriage never to cohabit or consummate the marriage and that if the plaintiff had known this, he never would have entered into the marriage; that the defendant created fraud upon the deceived plaintiff in that she concealed facts which would have affected the plaintiffs decision to enter into the marriage; that the defendant lacked the requisite intent to be married and misrepresented her intentions regarding the ceremony; and that the marriage ceremony itself was CT Page 14578 defective.
Count two, in the alternative, seeks a dissolution of the marriage on the ground that it has irretrievably broken down.
General Statute § 46b-40 (b) states that "an annulment shall be granted if the marriage is void or voidable under the laws of this state or of the state in which the marriage was performed." "It is the well-established law of this state that no marriage performed in this state is to be held void or voidable except for some ground recognized at common law or for some ground which a statute expressly provides shall be ground for annulment." Manning v. Manning, 16 Conn. Sup. 461, 461-62
(1950). "There are statutory grounds for annulment. General Statute § 46b-21 (Marriage of certain kindred); § 46b-22 (Marriage attempted to be celebrated by persons other than those listed); §46b-24 (Marriage performed in Connecticut without a marriage license); § 46b-29 (Marriage of persons under conservatorship or guardianship); § 46b-30 (Marriages of minors); § 45b-48 (Conviction of an offense against chastity)." Ross v. Ross, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. FA97-0162587 (1998) (Tierney, J.) (22 Conn.L.Rptr. 637, 638.)
In counts one and four, the plaintiff is seeking an annulment on the grounds that the defendant, prior to marriage, never intended to cohabit or consummate the marriage, and therefore, lacked the requisite consent required for a valid marriage. He alleges that if he had known the truth, he never would have entered into the marriage. In Bernstein v.Bernstein, 25 Conn. Sup. 239, 201 A.2d 660 (1964), the plaintiff was seeking an annulment of the marriage based on the ground that he was unaware that the defendant intended, prior to marriage, of not cohabiting or consummating the marriage with him. The court noted that the "fact of entry into marriage gives rise to a presumption that the parties intend to enter into a normal marital relationship. This includes cohabitation and all of the obligations, duties and responsibilities that go with a normal marriage. When a party consistently and from the beginning refuses to do or assume any of these things, without evidence of ratification a cause for annulment exists. There must be mutual consent to the marriage, and when only one party consents to the contract, there is no marriage. Since the defendant had the intention which existed at the time of the marriage ceremony of not cohabiting or consummating the marriage with the plaintiff, and the plaintiff was unaware of that intention at the time of the ceremony and would not have entered into the marriage if he had known of that intention, and the defendant continuously and wrongfully refused to carry out the purposes of the marriage, there is such legal cause as justifies the annulment of the marriage." CT Page 14579
"The law is clear that mutual consent is essential to a valid marriage." Schibi v. Schibi, 136 Conn. 196 (1949). "While it is true that, in passing upon a petition to annul a marriage, courts may well take into consideration whether there has been cohabitation or not, the fact that there has been none subsequent to the marriage ceremony is not of controlling importance, and particularly this is true where there has been prior sexual intercourse." See also Hassan v. Hassan, Superior Court, Family Support Magistrate Division, judicial district of Hartford, Docket No. FA 01-0632261 (September 2001).
"It is apparent that regardless of any specific intent which the plaintiff had with regard to his future cohabitation with the defendant, in entering into the marriage ceremony as he did he was contemplating the creation of the status of marriage for at least the limited period and purpose stated." Again, citing Schibi v. Schibi. See also, however,Sinojia v. Sinojia, Superior Court, judicial district of Waterbury, Docket No. 113953 (Harrigan, J., 12 Conn.L.Rptr. 483, 484) (where the parties married solely to permit an alien to remain in the United States under an agreement between themselves that they would not live together and a divorce would be secured within six months, the court noted that mutual consent was lacking and there was not a valid marriage).
See also Versaggi v. Versaggi, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. FA 95 0144557 (Harrigan, J.). "As a general principle, the formation of a binding contract requires the mutual assent of the parties, as determined by their expressed or manifested intention. The court is interested in those incidents leading up to the declaration of the marriage ceremony. Consent is a necessary condition to the marriage ceremony and this consent must be mutual."Phillips v. Dame, Superior Court, judicial district of New London, Docket No. 518815 (1991) (Mihalakos, J.) (4 Conn.L.Rptr. 650). "Failure to consummate the marriage does not in and of itself constitute grounds for the granting of an annulment." "The concealed intent not to assume the duties of the marital relationship is sufficient cause for an annulment. Intention at the time of the marriage is most important."
In count three, the plaintiff is seeking an annulment on the ground that the defendant created a fraud upon him and concealed facts that if known would have prevented him from entering into the marriage. "As a general principle of the law, the party who is induced to enter into a contract by fraud is entitled to rescind that contract. Similarly, a person who is fraudulently induced to enter into the marriage contract may have that contract annulled." Again, citing Phillips v. Dame,4 Conn.L.Rptr. 650. "It is the plaintiffs burden of proof to prove the CT Page 14580 grounds for annulment . . . A petition for the annulment of a marriage on this ground requires of the court hearing it great caution and demands clear proof . . . It must find that the conditions leading up to and surrounding the marriage have been established by clear and convincing evidence to be such as to render the marriage void or voidable." Citing again, Ross v. Ross, 22 Conn.L.Rptr. 642.
"Fraud in its procurement will vitiate the contract upon which marriage is based as well as by any other contract, and will justify its annulment by the courts . . . The rule to determine whether fraud in a case is sufficient to justify an annulment is set out in Reynolds v. Reynolds,85 Mass. 605 (1862). The Reynolds case established the doctrine of essentials which requires the misrepresentations claimed by the party seeking an annulment to be related to the sexual obligations of the marriage; that is, the ability or unwillingness to have sexual relations and the ability to bear children." See Fattibene v. Fattibene,183 Conn. 433 (1981). See Duren v. Burwood, Superior Court, judicial district of Litchfield, Docket No. FA 01 0084521 (August 2001) (Dipentima, J.), the plaintiff sought an annulment on the grounds that the marriage was voidable because the plaintiff was fraudulently induced to enter the marriage. The plaintiff expected a monogamous relationship where his wife expected that the marriage would be open. The court found that the plaintiff failed to prove the allegations to support a judgment of annulment because there was "no discussion regarding these expectations before the marriage." Moreover, an annulment is not favored. Citing again, Durham v. Miceli,
In Gregor v. Kamerling, Superior Court, judicial district of New Haven at New Haven, Docket No. FA 89 0257042 (August 1992) (Bassick, J.), the defendant sought an annulment on the ground that the plaintiff concealed his mental illness. The court noted that the question was "whether the existence or non-existence of the fact concealed or misrepresented operated, as between the parties, to prevent some essential purpose of the marriage and thus worked a practical destruction of their relationship."
It would appear from the testimony concerning the instant proceeding, that the plaintiff and the defendant, at least on the basis of the testimony adduced at trial, did not discuss the expectations of the marriage.
In count five, the plaintiff is seeking an annulment on the ground that the ceremony was defective and therefore the marriage is void. In Connecticut, "all ordained or licensed clergymen, belonging to this state or any other state, so long as they continue in the work of the ministry, are authorized to join persons in marriage." See Hassan v.CT Page 14581Hassan noted above. "In the present case, the defendant claims that the wedding was officiated by a licensed clergymen. The plaintiff denies this. Neither party has yet presented affirmative evidence as to whether the clergyman, if present, was ordained or recognized under Muslim Law. An evidentiary hearing might of necessity be required to address this issue."
In the present proceeding, the Lituanian marriage certificate was entered into evidence during trial and the court does not presently perceive the necessity for holding a separate evidentiary hearing with regard to that issue. As an alternative to an annulment of the marriage, count two of the plaintiffs amended complaint seeks a dissolution of marriage on the ground that the marriage has irretrievably broken down. Black's Law Dictionary defines the irretrievable breakdown of a marriage as a no-fault ground for divorce as "one in which either or both spouses are unable or unwilling to cohabit and for which there are no prospects for reconciliation." Black's Law Dictionary (5th Ed. 1979). In Donkinv. Donkin, 35 Conn. Sup. 123 (1978), the court found that "even though the terms `broken down irretrievably' are not specifically defined in § 46b-32 (c), the language is reasonably precise and it is an adequate standard to be used by the judge in making his or her subjective determination as to whether the marriage should be dissolved." In that matter, the court noted that the Connecticut standard for dissolution in that respect is almost identical to the standards in California, Florida and Georgia where the courts defined an irretrievably broken marriage as one "where either or both parties are unable or refuse to cohabit and there are no prospects for a reconciliation." The determination of whether a breakdown of a marriage is irretrievable is a question of fact to be determined by the trial court. Gregor v. Kamerling,7 Conn.L.Rptr. 743. See also, Eversman v. Eversman, 4 Conn. App. 611 (1985).
In the pleadings filed by the defendant, the defendant alleges that the marriage was one of intolerable cruelty and that the marriage broke down as a result of intolerable cruelty. Intolerable cruelty requires willful, intentional and deliberate acts that induce unnecessary pain. These acts must have the cumulative effect of making the marital relations unbearable; rude and vulgar remarks along with other vulgarity is not intolerable cruelty if there is no bodily harm; citing Sweet v.Sweet, 97 Conn. 693.
The court views with some concern the defendant's continued advertisements in the entity known as Kiss.com even after the marital union, even mindful of her explanation to the effect that one of the words was in error. CT Page 14582
As earlier indicated, the only witnesses in these proceedings were the plaintiff and the defendant. The neighbor Jennings, in the court's opinion, could have been called as a witness to testify as to the defendant's claims as stated at time of trial but no such witness was presented.
Intolerable cruelty has a subjective as well as an objective significance. There must not only be proof of acts of cruelty on the part of the defendant here in these proceedings but proof that in their cumulative effect upon the plaintiff, they are intolerable in the sense of rendering the continuance of the marital relation unbearable by him (or her), citing VanGuilder v. VanGuilder, 100 Conn. 1 (1923). See alsoGowdy v. Gowdy, 120 Conn. 508 and Taylor v. Taylor, 154 Conn. 340.
As concerns some of the defendant's request, query as to whether or not there is a valid reason for the court to consider rehabilitative alimony in the instant proceeding mindful of the brevity of the marriage and a recognition of the fact that the defendant wife has already apparently established herself in Ohio. Mindful of her education and medical background, the defendant needs no training in her field to become self sufficient. See Ippolito v. Ippolito, 28 Conn. App. 745 (1992) andWolfburg v. Wolfburg, 27 Conn. App. 396 (1992). The defendant, according to the testimony, does not suffer from any mental illness that would affect her ability to continue in her chosen area of employment. SeeHenin v. Henin, 26 Conn. App. 386 (1992).
It would appear that neither party invested the requisite time and energy to make the marriage work, but as between the plaintiff and the defendant, the defendant's leaving for Ohio so soon after arriving in this country and her permanent departure in January of 2002 made the union impossible to survive.
Among the various and sundry cases cited, including Carabeta v.Carabeta, the circumstances there were markedly at variance with the instant proceeding.
The court also notes that incident to the instant proceedings, no exhibit was offered to the court as a copy of or a substantially similar document pertaining to the alleged affidavit of support signed by the plaintiff and required by the Immigration and Naturalization Service at the time that he picked up the defendant at the airport. Again, no independent witness was presented to the court to sustain the claims of the defendant as to the requirement that she performed menial and overbearing tasks. Some neighbor or acquaintance or friend, including a friend in the neighborhood, could have assisted the court in this CT Page 14583 endeavor.
The court is mindful of the provisions of C.G.S. § 46b-28 entitled "When marriages in foreign country are valid," and sets forth herein the wording of the statute:
 "All marriages in which one or both parties are citizens of this state, celebrated in a foreign country, shall be valid, provided (1) Each party would have legal capacity to contract such marriage in this state and the marriage is celebrated in conformity with the law of that country; or (2) the marriage is celebrated, in the presence of the ambassador or minister to that country from the United States or in the presence of a consular officer of the United States accredited to such country, at a place within his consular jurisdiction, by any ordained or licensed clergyman engaged in the work of the ministry in any state of the United States or in any foreign country."
Perhaps the plaintiff should have suggested that the marital union be celebrated by a consular officer in Lithuania. At least in that setting, he would have been able presumably to understand clearly in English the nature of the words being spoken and the vows being exchanged.
 The Law
"A decree of annulment . . . shall give the parties the status of unmarried persons and they may marry again." Connecticut General Statutes § 46b-67b.
From the matter of Durham v. Miceli, 15 Conn. App. 96 (1988), "We recognize that an annulment and a dissolution of marriage differ fundamentally. An annulment renders the marriage void ab initio [from the beginning] while a dissolution is based upon a valid marriage which terminates as of the date of the judgment of dissolution."
"A direct action to annul a marriage not only affects the status of the marriage itself but may also affect property rights arising from this status." Perlstein v. Perlstein, 26 Conn. Sup. 257 (1966).
As concerns applicable statutory provisions, reference is made to C.G.S. § 46b-67b, "Neither the ninety-day period specified in this section nor the six-month period referred to in section 46b-53 shall CT Page 14584 apply in actions for annulment and the court may proceed on any cause of action for annulment in the manner generally applicable in civil actions."
Citing Bernstein v. Bernstein, 25 Conn. Sup. 239 (1964), "The two causes of action [dissolution and annulment] are distinguishing in that a divorce is based on a valid marriage and a cause which arises subsequently for terminating it, while an annulment is decreed on the theory that the marriage is void ad initio [from its inception]."
Again from Perlstein, "An action to annul a bigamous marriage may be brought either in the lifetime of the parties or after the death of the supposed husband or wife." That particular aspect of the concept has no present application.
As concerns the grounds for annulment, see Catalano v. Catalano,148 Conn. 288 (1961), "It is generally accepted rule that a marriage valid where the ceremony is performed is valid everywhere . . . There are, however, certain exceptions to that rule, including one which regards as invalid incestuous marriages between persons so closely related that their marriage is contrary to the strong public policy of the domicil though valid where celebrated."
In the instant situation, we are not concerned with any claim of a bigamous marriage nor are we concerned with lack of parental consent, citing Manning v. Manning, 16 Conn. Sup. 461 (1950). See also State exrel. Felson v. Allen, 129 Conn. 427 (1942), a marriage ceremony performed by an unauthorized person. See also Doe v. Doe, 11 Conn. Sup. 157 (1942) as concerns laboratory blood tests. See also Carabetta v. Carabetta,182 Conn. 344 (1980), "In the absence of express language in the governing statute declaring a marriage void for failure to observe a statutory requirement, this court has held in an unbroken line of cases . . . that such a marriage, though imperfect, is dissoluble rather than void."
Referencing Bernstein again, "The concealed intent not to assume the duties of the marital relationship is sufficient cause for an annulment."
See also Nerini v. Nerini, 11 Conn. Sup. 361 (1943). "My conclusion on the law, then, is this: all misrepresentations concerning one's health and fitness are immaterial unless they involve the essentialia to the marital relation such as a physical impediment making impossible the performance of the duties and obligations of the relation or rendering its assumption and continuance dangerous to the health or the other spouse or CT Page 14585 capable of affecting the health of their offspring."
Lyman v. Lyman, 90 Conn. 399 (1916) appear to have no applicability to our present situation.
In the instant proceeding, no issue has been raised to any lack of competency by either the plaintiff or the defendant with regard to their ability to enter into the claimed marital union.
On the basis of the testimony presented, there is no reason to believe that there was undue duress in the instant matter.
Manifestly, even though the intervals may have been brief, there was some cohabitation by the plaintiff and the defendant after the solemnizing of the union in Lithuania.
There was no claim presented to the court nor any testimony or evidence with regard to an issue such as concealment of impotency or the defendant's concealment of a condition of sterility.
On the basis of the testimony presented, it would appear clearly that there was no written antenuptial contract or agreement of any kind entered into by the parties prior to the marital union.
Both the plaintiff and the defendant submitted themselves to the jurisdiction of the court, were physically present before the court during the entire proceedings and both were represented by counsel of record.
The court, in its review of the file, has already touched upon the status thereof and the pleadings that were filed. The court notes that there was no additional answer filed to the amended cross complaint as best the court can determine from the state of the record.
There being no minor children or any children issue of this marital union, Hames v. Hames, 163 Conn. 588 (1972), would not appear to have any applicability.
Referring again to Catalano, a state has the authority to declare what marriages of its citizens shall be recognized as valid regardless of the fact that the marriages may have been entered into foreign jurisdictions where they were valid.
 ORDERS
CT Page 14586 The court enters the following orders mindful that it hasjurisdiction. See C.G.S. § 46b-44 (one year residency in Connecticut by one of the parties before filing the complaint.
The court after hearing the parties and incident to the entry of any orders incident to the dissolution of the marital union has considered the length of the marriage, the cause of the dissolution, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court has also considered the contribution or lack thereof of each of the parties in the acquisition, preservation or appreciation and value of their respective estates however modest.
The court has considered and weighed all required criteria in arriving at its decision. See Caffe v. Caffe, 240 Conn. 79 1997).
The court grants a dissolution of the marital union based upon irretrievable breakdown and declares the parties to be single and unmarried. The plaintiff failed to sustain his burden of proof in his claim for annulment.
The order earlier entered by the court, Devine, J., for alimony pendente lite shall be terminated.
The court declines to enter any order as to periodic alimony as requested by the defendant.
The plaintiff made no requests of any financial nature during the proceedings.
The plaintiff may retain his interest in the real estate known as 2 Smith Street, Pawcatuck, Connecticut and is solely responsible for the two mortgages presently in place against said property according to his financial affidavit.
The plaintiff may retain the two motor vehicles shown on his financial affidavit, the 1991 Nissan and the 1990 Toyota.
The plaintiff may retain household furnishings as shown on his financial affidavit except to the extent that there are any located within the confines of the residence that are the sole and separate property of the defendant, in which case, she shall be entitled to immediate possession thereof. CT Page 14587
The plaintiff may retain the modest checking and savings account.
The plaintiff may retain his teacher's retirement annuity as reflected upon his financial affidavit and his teacher's retirement, both of which items were not reflected by way of valuation on the financial affidavit presented to the court.
The defendant may retain the automobile reflected on her financial affidavit, any money or funds in any bank or checking account, and any and all assets reflected upon her financial affidavit.
In accordance with the oral request made at time of trial, the defendant may have her former or maiden name restored to her and henceforth she shall be known as Jurate Milutye.
Each party shall be responsible for their own attorney's fees.
___________________ Austin, J. CT Page 14588